## No. 11,768.

BLYMER ICE MACHINE COMPANY VS. R. T. McDONALD AND JUDAH HART.

The plaintiffs claim a balance, under a contract, for the erection of an ice machine complete.

The defendants deny that plaintiffs have complied with the contract, and deny that they made timely delivery of the ice machine.

The gravamen of defendants' complaint was against the absorber; that it was too small when the machine was operating with water at 90 deg. F. (the agreed temperature, for testing maximum capacity); that the absorbing apparatus was designed for a northern latitude.

The plaintiffs, on the other hand, urged that the boiler capacity was insufficient; that the steam was not dry enough, and that in consequence there were frequent stoppages; that this accounted for the deficiency in the daily output of the ice.

A few months after the machine had been erected the defendants sold it to a corporation in which they were the principal stockholders, and plaintiffs urge that in consequence of the sale the defendants are not entitled to damages and to a diminution of the price, for causes arising after the sale.

They claim more interest on the judgment, from which the plaintiffs appeal.

*With reference to the delivery of the machine the court decides:* There was delay on the part of each, the defendants in erecting the boilers and furnishing steam and water; the plaintiffs in not promptly having the machine ready to make ice at the agreed date. Both were at fault and neither was entitled to damages.

*Regarding the absorber:* Held, that the defendants not having incurred the expense of a new one, and it not having been shown that it was out of proportion with the remaining parts of the machine, and it not having been proved that the absorber was too small to achieve the stipulated output of ice, they were not entitled to a diminution of the price.

*The boilers:* At first the boiler capacity was insufficient, and when another boiler was added the test as made did not determine that the absorbing apparatus of the ice machine was defective and too small.

*Reduction of the price and loss of profits:* There was no such defect in the machine as would sustain a judgment for a reduction of the price.

As a general rule subject to some qualification, anticipated profits, prevented by breach of contract, are not recoverable as damages.

Damages for excess in the quantity of coal used prior to the sale of January 30, 1892, of the ice machine are not separately computed and proved. The repairs made on the ice machine, subsequent to the day of sale, were made for account of the purchasers, and not for account of the defendants.

*Interest:* The unsettled state of the claim sustains the judgment of the District Court allowing interest only from judicial demand.

APPEAL from the Civil District Court for the Parish of Orleans. Ellis, J.

*Rouse & Grant* for Plaintiffs, Appellees.

*Farrar, Jonas & Kruttschnitt* and *Rogers & Dodds* for Defendants, Appellants.

———

Argued and submitted June 17, 1895.
Opinion handed down November 18, 1895.
Rehearing refused March 9, 1896.

———

The opinion of the court was delivered by

BREAUX, J.  The Blymyer Ice Machine Company seeks to recover from the defendants a balance under a contract, and legal interest, for erecting an ice machine.

The contract between the plaintiffs and the defendants was prepared with some care, and contains a number of stipulations.

The plaintiffs agreed to make for the defendants an ice machine of the latest improved pattern and of a capacity of one hundred thousand pounds of the best quality of artificial ice per twenty-four hours, with cooling water at ninety degrees Fahrenheit, during the months of July and August, and to erect it in the city of New Orleans prior to the 1st day of June, 1891, with full charge of ammonia and salt for brine in the freezing tank, all complete for the manufacture of ice.  The Blymyer Ice Machine Company guaranteed that the plant would make five tons of good, clear merchantable ice to one ton of coal.

The plaintiffs agreed to make the retort of heavy steel and the coils therein with the joints on the outside; to make the tank of plate iron, with the freezing and brine tank insulated, encased in wood and furnished with covers.  The plaintiffs also promised to make the ammonia pipes subject to pressure of extra thickness, of the best iron and steel, and workmanship, and of special pattern for saving ammonia.  The test for these pipes was fixed at three hundred pounds per square inch.

The plaintiffs also contracted to furnish a complete distilling apparatus, filter, cranes, lifting apparatus and automatic can fillers.

The plaintiffs, in addition, was to prepare and deliver plans and furnish dimensions for buildings and foundations and platforms for machinery.

The plaintiffs engaged during two years to make needful repairs of

the machinery caused by defective material or defective workmanship.

The defendants bound themselves to have the buildings ready for the machine and not cause delay.

They also agreed to furnish a competent person to aid in the work of erecting the machinery under the direction of plaintiffs' engineer, in order that he might acquire needful experience to operate the machine for the defendants.

The defendants bound themselves to furnish the boilers.

They were also to have in readiness, when needed, a sufficient supply of water "convenient for the said party of the first part to make connections for distributing to the machine, tank and boilers.

"The parties of the first part agrees to and does sell to the parties of the second part machinery and apparatus complete for making ice in New Orleans, erected on the grounds of the parties of the second part, and the parties of the second part are to pay for the same the sum of forty-one thousand five hundred dollars, and to build the necessary buildings according to the plans and specifications to be furnished by the parties of the first part, and furnish the boiler set ready for first party to make steam connections."

Subsequently, in a separate agreement modifying the first, in consideration of an allowance of three thousand dollars in the price, the defendants consented to postpone the date of delivery from June 1 to July 1. On the 30th of January, 1892, the defendant, Judah Hart, who held a controlling interest, sold the entire plant; the property sold consisted of the ice machine, lands, and the other improvements thereon for full consideration.

The defendants denied in their answer that the machine came to the capacity required. They specially allege that plaintiff began to work on the ice machine late in June, 1891, too late to timely comply with their contract.

They claim judgment for damages growing out of the delay in not having delivered the ice plant at the time fixed, on the 1st of July, and they urge that, by plaintiff's fault and negligence, the ice machine was not constructed and ready to make ice prior to the 4th day of September, 1892, and that they thereby were made to lose the opportunity of selling fifty tons of ice per day during the months of July and August, 1892, which they would have sold at a clear profit of four dollars per ton.

The issues on the reconventional demand are abbreviated by the admission that the amount due the plaintiffs on the ice machine was the balance twenty-six·thousand six hundred and seven dollars and seventy-one cents, and that judgment should be rendered for this sum, unless the defences interposed should be held to be good. The following items are sustained by the lower court's decision:

Item of eight hundred and forty-six dollars and twenty-six cents claimed in account E.

The learned Judge of the District Court allowed only fourteen dollars and eight cents of this account. The remainder was rejected by him for the reason that it bore date subsequent to January 30, 1892, when the defendant sold the ice machine and plant to the Municipal Ice Company.

He held that after that date, defendants having ceased to own the machine, or to control it, they were without capacity to claim for expenditures made on the plant.

He also, assi_ning substantially the same reason, rejected the claim of five thousand dollars made by the defendants to pay the cost of a new absorber to put in the place of the one which the defendants claimed was deficient in capacity and too small to make fifty tons of ice with water at ninety degrees. By supplemental answer the defendants sued for a reduction of ten thousand dollars on the price of the machine because of the alleged failure to make five tons of ice with one ton of coal.

From a judgment for the plaintiff for twenty-six thousand five hundred and ten dollars and fifty-three cents, with interest from judicial demand, the defendants appeal.

### FACTS REGARDING THE ALLEGED DELAY IN DELIVERING THE MACHINE.

In our summary of the evidence, we enter in the first place on the subject of defendants' claim for plaintiffs' delay alleged in erecting the machinery—sixty-six days at one hundred and twelve dollars per day. From the terms of the contract we infer, as there was no stipulation made regarding the date the plans of the building for the ice factory were to be delivered by the plaintiffs to the defendants, that they were to be furnished within a reasonable time. There were delays on each side—the plaintiffs in delivering the plans, and defendants in having alterations made in the plans, and afterward by

delays in undertaking the erection of the building under the plans. With reference to the delivery of the machine after the building had been erected, the facts are, that the defendants were slow in placing the boilers in the proper place. They were not put up, nor sufficient steam supplied on the 1st of July, the date agreed upon between the contracting parties.

The plaintiffs, also, were not ready at that date to operate the machine.

It is a fact, also, on the other hand, that the defendants did not employ a person to aid in the work of erecting the machine as required by the terms of the contract.

### FACTS OF ABSORBING APPARATUS.

The absorber was too small; the machine was designed for a different climate and temperature are defendants' complaints. We have deemed it necessary, to a conclusion, to examine each of the constituent elements of the ice machine and give some study to the *modus operandi*.

The first in importance of the different parts of the machine is the retort or still, consisting of a cylinder containing coils which are submerged in *aqua ammonia*. By heat of the steam which communicates from the boilers into these coils, the ammonia gas is separated from the *aqua ammonia* and forced into a pipe which empties into the upper condenser where the aqueous vapor is separated from the gas. The aqueous vapor then drains back into the retort and the ammonia gas is conveyed through a pipe to the lower condenser, which is filled with coils immersed in the cold water. The gas condensed in the lower condenser is conveyed into the coils contained in the brine tank. In passing this ammoniacal gas through the coils of the brine tank, the brine is kept down below the freezing point of the water, placed in cans to be frozen. The heat of the water is absorbed by the brine. Returning to the operation of the retort or still, we note that the poor liquor at the bottom of this vessel is pressed from it through a pipe to a cooler, in which the coils are immersed in cold flowing water. Afterward this poor liquor is conveyed into the absorber, where it comes in contact with the generated gas from the refrigerator. The poor liquor absorbs the gas, here it is cooled and becomes again rich liquor and is conveyed to the retort and again the ammonia gas is freed and separated from

the poor liquor in the still, and is conveyed as before through pipes and coils in tanks to the refrigerator.

### EVIDENCE RELATING TO THE BOILERS.

The next factor of importance are the boilers. We have already stated that the defendants furnished the boilers. They were informed by the plaintiffs that it would require boilers of two hundred and twenty-five horse-power, and of a capacity to evaporate eight pounds of water to one pound of coal. At first the defendants furnished two vertical tubular boilers. The complaint was, a number of times, brought to defendants' attention; that they did not supply sufficient steam; that the water foamed and the steam was not sufficiently dry; that the construction of the boilers was such that the body of water was not in proportion to the heating surface or steam space, and that in consequence the steam was saturated and conveyed water in the pipes, and moreover that they did not produce any superheated steam. An expert for defendants, regarding plaintiffs' complaint of the want of latent or superheat, testified that there was about one and two-thirds per cent. increased efficiency in these boilers owing to superheated steam measured in water evaporated, per pound of coal. It is in place to state that the witness also testified: that it was necessary to blow off water at times during the last test, and that it was not practicable to determine accurately the amount of credit the boilers were entitled to therefor; that the superheat was treated as an equivalent to the water blowed off. In other words he did not credit the boiler with the water blown off or debit them with the superheat. The loss of the power was equivalent to the gain by the latter, i. e., the loss of heat by the blowing off of saturated water from the steam boilers was considered a set-off to the superheated steam not allowed. The fact remains that the two first boilers put in were not of sufficient strength. Regarding the use of steam in ice making, we are informed that it is used to pump water into the tank; to blow through the ammonia retort; to operate the ammonia pump and the boiler feed pump; to produce distilled water, that it requires dry steam to operate the pumps, such as those supplied by plaintiffs. It is also in evidence that the pressure of the steam from the boilers does not directly affect the absorber, and it is further contended that if there was steam enough to run all the parts where steam

was used, the deficiency of the machine where steam was not used should be separately considered, *i. e.*, without reference to the steam necessary affecting other parts of the machine.

To this statement, the plaintiffs interpose the answer, that the steam pressure in the boiler was very variable; the heat was not sufficient for the proper distillation of the ammonia in the retort and that the supply of the poor liquor to the absorber was not what it should have been.

It is in proof that the strength of the rich liquor was twenty-eight and one-half Beaumé, and of the poor liquor twenty-one and one-half, and it is stated in evidence that the strength of the poor liquor will vary and affect the operation of the absorber, when the steam pressure in the retort is not regular.

In short, the plaintiffs urge that the failure to make the number of pounds of ice was entirely caused by the insufficiency of the steam of the two boilers and their defective construction; while the defendants are equally as persistent, in their contention that all the trouble arose from the weakness of the absorbing apparatus furnished by plaintiffs. A highly competent expert (commended as such by the defendants), who had charge for them of the last test of the machine, testifies that the machine was well made: "It is a good machine in theory, design and workmanship." At another point of the examination, the same witness states: "I think the absorber is not large enough to handle a sufficient quantity of gas under the conditions that existed with the temperature at 90 deg. to permit the machine to make its output of ice." The remaining evidence will be considered on the merits, with the law of the case and. upon the facts.

In their answer to the appeal the plaintiffs pray that the judgment appealed from be amended so as to award interest to the plaintiffs at] the rate of six per cent. from September 1, 1891, on eighteen thousand dollars, and at the rate of five per cent. on the balance of the judgment from that date.

#### EFFECT OF SALE OF ICE MACHINE.

The defendants having sold the ice machine, together with their plant, could not retain the price and offer to return the property; but they claimed damages and a reduction of the price. The damages claimed as having been suffered, *after* the defendants had sold the

property to a joint stock company, for a fair price, can not be re-covered by them.

They had parted with their interest.

Although they were the principal stockholders of the company, their right by the sale of the property to the company had become so completely merged into the company that they could no longer obtain damages on a machine operated by the company for its own account and not for the personal account of the defendants. More-over, is it possible to decide that such a corporation has not a sepa-rate, independent existence in presence of the law's declaration that such corporations are judicial persons with rights distinct from those of the shareholders personally. If the defendants were entitled to damages *prior* to the sale, they were not divested of that right by the sale; nor did the sale defeat their right of action *quanti minores*.

### TIMELY DELIVERY OF THE MACHINE.

Our statement of the facts regarding the delivery of the machine and the delays urged as ground to recover one hundred and twelve dollars per day damages, leave but little for us to decide on that point. The defendants themselves were partly responsible for the delay. Their buildings were not ready to receive the machinery; they did not furnish the steam and water to make the test and to begin opera-tion. One can not avail of delays to which he has contributed as grounds for damages. Moreover, they were not in position to place plaintiffs in default. The one "wishing to put the other in default must be himself ready." R. C. C. 1914.

### CAPACITY OF THE ABSORBER.

The objection to the absorber is not sustained by the weight of the testimony. The defendants complain more particularly of the ab-sorber as being too small. The evidence relates to the alleged inef-ficiency of that apparatus—that it is too small to perform the func-tions required. The strength of machinery, intimately connected in all its parts and dependent for its successful operation upon the energy of each element, is to be measured by the maximum capacity of its weakest point, as a chain, for instance, is only as strong as its weakest link. In the first trial it was not determined with absolute certainty which was the weakest point of the machine and the cause of the deficiency in the production of ice—whether it was the ab-

sorber or the boilers. The fact that it (a short time subsequently) became necessary to put in another boiler gives strong grounds to presume that the boilers, during that test, at any rate, were ineffi- cient.

Regarding the absorber, it is in proof that the average tempera- ture of the overflowing water in this vessel was 113.34 deg. with cooling water at 90 deg. There was nothing unusual, in so far as re- lates to the back pressure here, and nothing unfavorable was shown in that respect. The heat was not greater than usually felt in such vessels of an ice machine. The strength of the poor liquor was one of the subjects of inquiry. That liquid is sent from the retort to the absorber under pressure from the retort. The functions of the ab- sorber are to receive the poor liquor from the retort and the ammo- nia from the refrigerating tank. In this absorbing apparatus they are converted into rich liquor, it passes into the rich liquor vase and from that vase it is pumped into the retort. The strength of the poor liquor is not principally owing to the functions of the absorber, for we have noted that, the higher the pressure in the retort the poorer and better the liquor that is sent to the absorber. This poor liquor moves from the retort to the absorber, and not *vice versa*.

With reference to the difference in temperature and the defence that in designing this machine account was not kept of the difference between the temperature north and that south, and of the differ- ence in the moisture here, where the air is very moist. The wit- nesses for plaintiff state: machines of the same capacity sold north were sold as sixty and sixty-five-ton machines, and the one sold here was sold as a fifty-ton machine, allowance having been made for difference in exterior temperature and the difference in cooling water.

It is in proof that it is possible, with reasonable certainty, to de- termine the capacity of a machine (designed for water at 54 deg. and fifty-five or sixty tons of ice), and how much ice it would make with cooling water at 90 deg.; but in all this the retort and the ab- sorber are intimately connected. One wants the aid of the other. *Unus eget auxilio alterius.* We are not prepared; indeed, the record does not show such a state of facts as enables us to determine that either is an offending organ in the system of the ice making ma- chine.

It is true that the rich liquor which flows directly from the ab-

sorber was 28.05 Beaumé, and that in machines in perfect condition it very rarely shows over 28, and that the poor liquor which flows from the retort *to* the absorber was 21.05. In a machine operating under favorable conditions the poor liquor will show about 18, when the rich is 28. The difference here, during a test made under the circumstances that it was made, was not such as enables us to condemn the absorber as a failure.

One of defendants' witnesses, a scientific expert, estimates that at 20 deg. higher, the capacity of the machine would be lessened to the extent of about seven per cent., *and the consumption of coal increased about five per cent.*, by the moisture and atmospheric condition. If such a calculation can be made regarding moisture and temperature, it follows that the effect of differences in the temperature of water on the production of ice can be ascertained with some degree of certainty.

The experts differ on many points:

Those who testified for the defendant assert that they operated the machine to greater advantage by keeping the temperature of the brine tank at 25 deg.

They refer to the favorable result they obtained with the brine at that degree of temperature. The experts for the plaintiffs testify that it should have been much less; that it should have been reduced at least to 16 deg. or 17 deg. in order to effect good work with expedition. They also refer to practical operations of ice machines, and of the power necessary to transform water at the freezing point with ice as stated substantially in our statement of facts.

The second test was equally as unsatisfactory. It was made more than a year after the first test, without having given timely notice to the plaintiffs. The machine was not overhauled, cleaned, repaired, contradictorily with the plainiiffs.

It devolved upon the defendants to give timely notice to the plaintiffs of the test they deemed necessary to determine their respective rights. They were in possession and were operating the machine; any cause of complaint the defendants had should have been timely communicated to the plaintiffs, and an opportunity offered to remedy the defect. Together with the want of timely notice and preparation for the test, the plaintiffs urge upon our attention the testimony: That the brine in the brine tank was below the top pipe of the coils; that the design of the machine is that the

ammonia passing through the coils shall absorb the heat from the brine, but that when the coils are above the brine it only absorbs it from the atmosphere. Also that there were holes in the brine tank, and all causing loss to the machine; that there was an accumulation of hydro-carbon gas in those coils, which prevented the circulation of the anhydrous gas; which occupied the space and absorbed no heat, causing loss in the freezing tank and waste of coal to heat a second time the anhydrous gas in the retort; that the temperature of the brine tank was too high; that the absorber valves were almost entirely closed; that the steam-condensing coils leaked; that the witnesses in charge of the trial for defendants were absent most of the time, and other similar objections, which demonstrate the necessity there was of notice to plaintiffs and common preparation on part of both plaintiffs and defendants for the test.

Under the circumstances we do not think that the defendants have sustained their claims in reconvention.

Granted, for a moment, that the absorber was too small, the contract price for the machine does not seem to have been agreed upon with reference to anticipated profits, in the event of defect of the machine. The general rule is that such profits are not recoverable as damages, unless it may be reasonably presumed that they were within the intent and mutual understanding of the contracting parties.

Regarding the boilers, defendants' obligation was to furnish the required steam power. During the first test it was evident that the steam was insufficient. The third boiler was erected some time after this test; that fact alone shows that the other two were not of sufficient strength. Plaintiffs' witnesses are pronounced in their utterances against upright tubular boilers as steam generators in ice making. Save that the boilers, even after the number was increased to three, do not seem to have been in favor with nearly all the witnesses, there does not appear, after these boilers (the three), came into use, to have been any considerable objection to them.

### REPAIRS TO THE MACHINERY.

The plaintiffs bound themselves to supply, free of charge, for two years, any repairs of the machinery, on account of breakage. The expenses incurred for repairs on the machine prior to the sale of January, 1892, made by the defendants to the Municipal Ice Com-

29

pany, were allowed by the lower court. The items for repairs made subsequent to the sale were rejected. The evidence as to the last expenses, in point of date, did not bring them within the terms of the contract. It was not shown that they became necessary "on account of breakage of defective material or workmanship," words evincing condition of the sale. Moreover, plaintiffs were entitled to some notice prior to making these repairs.

In addition, the property having been sold, the defendants had no claims for repairs made by their vendee.

### LOSS OF PROFITS—REDUCTION OF THE PRICE.

The question of excess of consumption of coal comes up first under this heading for consideration. It is claimed by the defendants that the machine is not capable of making five tons of ice upon one ton of coal. This, we judge, was agreed upon as a measure to be followed in testing the capacity of the machine, and was not agreed upon to operate in the nature of a "royalty" or amount to be recovered in case of deficiency. It would be somewhat in the nature of a "royalty" (not contemplated, as we understand, at the date of the contract), if defendants were allowed a continuous claim for damages, based on the number of pounds of coal consumed in excess of a stated number; it would be continuous, for if they had the right prior to the sale it would continue in some one after the sale.

In the brief that view is not argued, and claim for damages on that ground is not pressed.

The reduction of the price is the next question to which we desire to give attention. It is true, the right to a reduction of the price, because of the defect in the property sold remains with the buyer, even after he sold it to a third person who became his vendee. That principle was announced in the case of Brown vs. Duplantier, 1 Martin, N. S., 317.

The condition here is different.

The question is more particularly one of damages than one of defect of the machine. The damages claimed are uncertain and remote and for profits anticipated, which possibly never would have been realized.

A similar question was decidedly against the allowing the amount claimed in Howard vs. Stillwall & Pierce Manufacturing Company, 139 U. S. 199.

Finally, although the first decision cited (Martin's) inspires confidence in the conclusion reached, we can not avoid the thought that only in a very clear case the vendor of a defective machine, who has sold it for a consideration equal to the price paid by him, is entitled to recover a claim for asserted defects.

### INTEREST.

The plaintiffs claim more interest than allowed by the judgment of the District Court. Under the circumstances of this case, we do not think that the contract, in so far as relates to interest, should receive the close interpretation for which the plaintiffs contend. They prayed originally for interest from judicial demand; this was properly granted without reference to the amendment for a larger amount.

The judgment is affirmed.

NICHOLLS, C. J., was not present when the case was argued and takes no part.