**INTERSTATE RUBBER PRODUCTS CORP. et al. v. RADIATOR SPECIALTY CO., Inc. et al.**

Civ. No. 860.

United States District Court
W. D. North Carolina, Charlotte Division.

Aug. 7, 1953.

Walter P. Huntley, Fulwider, Mattingly & Babcock, Los Angeles, Cal., John G. Newitt, Charlotte, N. C., for plaintiffs.

A. Yates Dowell and A. Yates Dowell, Jr., Washington, D. C., Maurice A. Weinstein, Charlotte, N. C., for defendants.

WARLICK, District Judge.

This is an action for infringement of Patent No. 2,333,273, issued to Charles D. Scanlon, on November 2, 1943,—based on his application, dated February 17, 1941, for a patent on a device in producing so-called traffic markers in the shape of a cone from discarded automobile tires. The principal defenses are invalidity and non-infringement.

### The Facts.

Sometime in the fall of 1940, Charles D. Scanlon, an employee of the Traffic Department of the City of Los Angeles, became interested in the use of markers for directing traffic and other means; and as a result of a conversation had by him with one Rodney B. Taylor, a tire shop operator in said city, decided to put into practice his ideas by use of fabric and rubber from old tires, as suggested by Taylor,—cutting the material in such way that it would form into a conical shape. Scanlon and Taylor produced a few such conical shaped devices, and added a base of a harder substance, so as to give the cone shaped property a receptacle on which to rest. Not too long thereafter production was abandoned in view of their inability to obtain old tires and the rubber and fabric therefrom. Thereafter Scanlon, on obtaining the patent in suit, after applying for it in his own name, assigned one-third interest each therein to Roscoe J. Arnold and Rodney B. Taylor. Subsequently Arnold sold his interest in equal parts to Scanlon and Taylor, thereby constituting these two as the owners thereof.

On November 5, 1946, Scanlon and Taylor entered into an exclusive license agreement with Charles Terry and Robert L. Mitchell, trading as partners. On January 3, 1948, Mitchell sold his interest in the partnership and in the license agreement to Terry.

Later on and on December 1, 1950, Terry assigned his holdings in the license agreement and the property of the partnership by proper conveyance to the Interstate Rubber Products Corporation.

This action is brought by such corporation as plaintiff as exclusive licensee under the patent from Scanlon and Taylor.

Rodney B. Taylor, assignee, voluntarily joined himself as a party plaintiff and on the refusal of Charles D. Scanlon to become a party plaintiff as the original patentee and part owner thereof, was involuntarily made a party plaintiff to the action.

The corporate plaintiff was organized on August 7, 1950, under the laws of the State of California, and possesses the rights and privileges of a corporation under the laws of that state.

The defendant, Radiator Specialty Company, is a North Carolina corporation and has been in existence since July, 1927, with its principal place in Charlotte, in the Western District of North Carolina, and manufactures specialty articles. The individual defendants, Isador D. Blumenthal, Herman Blumenthal, and J. J. Duckworth, are officers and directors of said corporation.

Plaintiff's predecessor in title began production of said traffic markers in March 1947, and production thereof has continued throughout the intervening period. All of the markers manufactured had round bottoms until some time in March 1952, when the plaintiff corporation began manufacturing markers with a square base and has alternately produced both round and square bases since that date.

Plaintiff's product is made, at this time and for several years, from rubber sheets which are placed into a mold and heated under pressure and as such constitute one production item. Originally, however, it would appear, as the application for patent will show, that Scanlon based his claim to an invention on the particular manner in which he and Taylor cut strips from old tires to form a cone shaped object. The product as made since 1947 has had a ready sale and has enjoyed a receptive market from the time of its first production, but no commercial success came from the

efforts of Scanlon and Taylor in the making of the markers from strips of old tires.

Sometime during the spring of 1949, I. D. Blumenthal, one of the defendants, and president of the defendant corporation, while on a visit in Los Angeles, saw certain of the plaintiff's traffic markers being used on the streets of that city, and ascertaining the name of the producer thereof, contacted the plaintiff corporation with the idea in mind of handling this product in the eastern territory through the defendant corporation. However, in various contacts with representatives of the plaintiff, he was unable to effect any sort of working agreement, and gave up the idea of becoming such agent of the plaintiff in the East. Blumenthal and his associates in the intervening months, made a careful study of traffic markers manufactured by plaintiff, looked into the matter of the so-called patent, and securing certain information, decided to manufacture a commodity answering the same purpose. Thereupon a mold maker on the West Coast who had previously made molds for uses in various capacities for the defendant, was employed and in line therewith made a mold used by the defendant in the manufacture of its traffic markers.

There are a number of different characteristics between the cone-shaped marker manufactured by the defendant and that made by the plaintiff, though the two have a similar appearance when placed side by side, and when similar paint has been used, —the biggest difference being that the product of the defendant has a square base and that of the plaintiff has a round base as set out above. Other differences are minor. The product of the defendant has likewise met with a considerable degree of success and both have proven of a relatively great help in directing traffic in cities and towns, and other purposes for which they are similarly used. The product of the plaintiff is molded from sheets of rubber; that of the defendant is from blocks of rubber. Both are placed in molds and melted under heat and assume therefrom the form and shape of the mold in which made.

The defendant began the manufacture of its product in the fall of 1951, designating it as "Safe-T-Cone" and received a trademark registration in the Patent Office on January 6, 1953.

During the spring of 1952 plaintiff corporation began production of a square base marker and incidentally set up the "Safety Cone Traffic Corporation", and through that corporation has marketed the square base products of the plaintiff,—Charles Terry being the owner of all stock in the plaintiff corporation as well as the Safety Traffic Cone Corporation.

It would seem that the principal issues in the case are those of validity and infringement,—other side issues are injected in the case, but a determination of either or both of these as it will be made will be an answer to the controversy in suit.

The plaintiffs contend that "The patent in suit is valid because it describes and claims a new and useful manufacture * * * and was duly * * * issued in compliance with the law." That in addition thereto

a. "The presumption of validity of patent in suit must prevail because defendants have not sustained the burden * * *."

b. "The claims of the patent in suit define 'invention' over the prior art and therefore are not invalid for want of invention."

c. "Patent device is new and revolutionary and provides advantageous results never before achieved."

d. "The patent claims clearly define the *Patented* new and useful improvement and patentably distinguished from the prior art",

and many other contentions as appear in the evidence and as are set down in the briefs filed by the plaintiff.

The defendants make defense and contend:

1. "Making traffic cones of rubber is not invention."

2. "The patent is void because of insufficient disclosure."

3. "The claims are broad enough to read on the prior art."

4. "The patent is invalid because it fails to fully describe how a traffic cone

can be constructed and that there has been no infringement thereon",

and various other contentions, as appear in the evidence and as are shown by the record in the case and the briefs filed by the defendants.

The patent allegedly infringed is relatively a simple sort of thing. Various exhibits were offered indicating sizes and models as manufactured by the plaintiffs, and likewise exhibits of size and models as made by the defendant were shown to the court and offered in evidence in the trial of the cause. The record in the case and every part thereof is very voluminous. It would seem that to patent lawyers nothing must be left out, all must be placed in, and the record must contain every idea, every thought, every suggestion, etc., in order to be complete. The briefs of the plaintiff constitute 132 typewritten pages. Those of the defendants add up to 68 pages.

After having gone thoroughly into the matter and following a three-day hearing in which evidence was taken, I am of the opinion that a simple sort of thing like unto that allegedly infringed is not the subject matter of a valid patent, and that a decision on that point would be a final determination of the whole controversy. Cone-shaped objects have been known since ancient days, and have been made in one form or another by Man well-nigh since those times. The Pyramids of Egypt constitute a fair example of Man's knowledge of that sort of thing. Markers of various materials have been used in many ways, on athletic fields, in Europe and America. The textile industry for many years has used cone-shaped products of corrugated pasteboard of varying sizes, on which the industry winds yarn. Megaphones of cone shape have been in existence for a long time and have been used to relay one's voice. Many of these items can be stacked (nested) one upon the other as is claimed in the patent of plaintiff and practically all of them, having a larger base than the top, will remain upright. Instance after instance could be cited of similar items being either made of rubber or other product and similarly shaped. Our ancestors used molds in which to fit and form their lead into bullets, after

melting the lead into a liquid. So we deal with a thought which is not new or novel, but which is almost as old as time. In this patent there is nothing novel about a cone and no claim as such is made; there certainly is nothing novel or new about rubber except its varying uses, and to contend that a combination of the two is patentable is rather difficult to understand. Goldman v. Polan, 4 Cir., 93 F.2d 797.

■ The Supreme Court in a very recent case presents anew its thoughts on the subject of patentability and links it to the standard written into the constitution. The question of the validity of a patent is a question of law and narrows itself down to the standard of invention. Every patent is the grant of a privilege of exacting tolls from the public, and that is why through the years the opinions of the court have commonly taken inventive genius as the test. It is not enough that an article is new and useful. Great Atlantic and Pacific Tea Co. v. Supermarket Eq. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

■ The plaintiff relies heavily on the showing that this cone-shaped device filled a long-felt need and had enjoyed a great commercial success immediately upon being placed on the market. The answer to that is that commercial success without invention does not make patentability. Rubber has been used in molding objects since it was first discovered and its value learned and cone-shaped objects as set out herein have likewise been known for generations, so every element embraced in this patent and claimed here has been known to the prior art. Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334.

■ One among the essential requirements for the validity of a patent is that the subject matter display "invention", "more ingenuity * * * than the work of a mechanic skilled in the art". Hicks v. Kelsey, 18 Wall. 670, 21 L.Ed. 852, and many other cases cited therein. This test is often difficult to apply but its purpose is clear. Under this test, some substantial innovation is necessary,—an innovation to which society is directly indebted to the efforts of

124

the patentee. Whether or not those efforts are of a special kind does not concern us. The primary purpose of our patent system is not reward of the individual, but advancement of arts and sciences. Sinclair & Carroll Co. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

As was aptly said in the Great Atlantic and Pacific Tea Co. case, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, this case presents a good illustration of the attempts made to get a broader, looser conception of patents than that contemplated by the constitution. The evidence herein discloses that at least a dozen patents had previously been granted various applicants for devices somewhat similar and much analogous to the marker herein. All of these patent ideas were for street markers of one kind or another. Each was made of rubber or rubber products, and was a molded or blended item. This granting by the patent office has step by step lengthened the field and added to the monopoly.

I, therefore, come to the conclusion that the device for which the patent was granted does not measure up to that of invention and that in failing so to do it is invalid, and being so is not infringed by the product placed on the market by the defendant.

Judgment in accordance herewith will be tendered.