**INTERSTATE RUBBER PRODUCTS CORP. et al.**

v.

**RADIATOR SPECIALTY CO.,**
Inc. et al.

No. 6783.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1954.

Decided July 26, 1954.

Parker, Chief Judge, dissented.

Walter P. Huntley, Los Angeles, Cal. (Edward B. Beale and George R. Jones, Washington, D. C., on the brief), for appellants.

A. Yates Dowell and A. Yates Dowell, Jr., Washington, D. C. (Maurice A. Weinstein, Charlotte, N. C., on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This case of patent infringement relates to United States Patent No. 2,333,-273 issued to Charles D. Scanlon on November 2, 1943 upon an application filed February 17, 1941. The patent pertains to a safety marker which comprises a hollow conical body, particularly the kind of marker used on highways to indicate wet paint, repairs, &c. Claim 1 of the patent describes the product in these words:

"A marker of the character described, consisting of a tapering

hollow body of substantially uniform thickness formed of resilient sheet material, and a relatively heavy base secured to the lower marginal edge of said body and projecting laterally therefrom to provide an extended support to stabilize said marker in upright condition, said body being open at its lower end and unobstructed to admit of the markers being nested."

In appearance the marker in place resembles a megaphone about two feet in length, set on end. In practice it is made of rubberized sheet material, and the specifications suggest that for reasons of economy, strips of rubberized fabric, cut from old automobile tires, may be used in the manufacture, although new material may be employed. The inventor's purpose was to replace the wooden tripods or barriers, theretofore customarily used to indicate dangerous spots or newly painted lines on the highway, which were not easily seen, were readily broken or worn out, and presented some hazard to passing automobiles. The advantages of the patented article are manifest; it is readily visible, causes no damages to an automobile which strikes it, returns to its original position when struck a glancing blow, is easily nested or stacked so as to require a minimum storage space, and may be placed in position or removed by an operator seated in a moving vehicle, and it will stand considerable abuse.

The patented marker has also been found useful for shifting the "center line" of much used highways in the City of Los Angeles during peak traffic hours so as to provide an additional lane in the direction of the heavy flow of traffic which runs in one direction during the morning rush and in the opposite direction in the afternoon. For this purpose the easily handled rubber marker has been found much more desirable than the heavy iron pedestals formerly employed.

As the result of these several advantages the patented marker has had considerable commercial success since production began in 1947, and has been used throughout the United States, as well as in some foreign countries. These merits were quickly recognized by I. D. Blumenthal, the president of the Radiator Specialty Company, Inc., and an appellee herein, who sought unsuccessfully to secure a license under the patent, and then, being advised that the patent did not involve invention, placed a competing device on the market which is so similar to the plaintiffs' as to remove all doubt of infringement, if validity is shown. Hence we need consider only the latter question.

We are in accord with the conclusion of the District Judge, 114 F. Supp. 120, that the disclosures of the patent did not involve invention since they comprised nothing beyond the competence of a person having ordinary skill in the art to which the subject matter pertains. The history of the patent throws light upon the inquiry. In 1936 Scanlon was employed as a painter in the Street Painting Department of the City of Los Angeles and observed the inadequacy of the markers then in use. In 1940 the idea of the patented marker occurred to him and in collaboration with a tire shop operator he decided to put it into practice by making a marker of fabric and rubber from old tires; and a few of the markers were made. Not long afterwards production was discontinued because of the inability to obtain the materials due to war conditions. The patent was applied for in 1941 and granted in 1943; and later when production was resumed it was found desirable to use collapsible sheet material, as described in the claims of the patent, and to mold it under heat and pressure in the form in which it is now used in actual practice. The product has met with the success above described.

The hollow conical shape has of course long been employed in numberless objects in common use, for example, megaphones, flower pots, dunce caps, &c. which may be nested one within the other; and the prior art suggested the use of other desirable features of the

product for like or kindred purposes; for example, the O'Toole patent, No. 1,-337,947 disclosed a collapsible signal post of rubber, which would not injure a passing vehicle when struck and would return to its normal position; the Warren and Hornby patent No. 1,824,643 showed markers to be used at the side of a football field which were hollow and wider at the bottom than at the top and were made of rubber so as not to injure a player who might collide with them. This fund of common knowledge was available to all persons interested in the problem, so that the solution, although a beneficial and successful improvement, did not in our judgment involve the exercise of the inventive faculty.

It is quite impossible to define patentability except in the most general terms. It cannot be denied merely on the ground of the simplicity of a discovery, as appears in the classic example of the Eibel patent, Eibel Process Co. v. Minnesota Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; see also Goodyear Tire & Rubber Co. v. Ray-O-Vac, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; but it does not come into being merely because the device is novel and represents an interesting and useful improvement. The touchstone is whether the new thing is beyond the ability of the worker of ordinary skill in the field, and neither the courts nor Congress have been able to offer a more definite test, so that in the end it must be left to the judgment of the courts in controverted cases to apply the formula to the specific facts; and the judges may not endow with the quality of invention every new and useful advance amidst the myriad activities of a resourceful people.

A similar lack of invention was found by the Supreme Court in Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, where a cashier counter, equipped with a three-sided frame that was used to move groceries deposited within it by a customer, was held devoid of invention although the device served to speed the customer on his way, reduced the operating costs of the merchant and had been widely adopted and successfully used in the trade. The court pointed out that commercial success without invention will not make a product patentable, and said, 340 U.S. at pages 152–153, 71 S.Ct. at page 130:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

The rule applied by the majority of the Supreme Court in this case was not changed by the revision of the patent statute by Congress in 1952. Section 103 thereof, 35 U.S.C. § 103, provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

■ As stated in the Senate and House Reports during the enactment of the statute by Congress and in recent decisions of the courts, the provisions of § 103 merely codified the law laid down by the courts during the past hundred years, and were added to the statute for purposes of uniformity and definiteness. See Stanley Works v. Rockwell Mfg. Co., 3 cir., 203 F.2d 846; General Motors Corp. v. Estate Stove Co., 6 cir., 203 F.2d 912.

Affirmed.

PARKER, Chief Judge (dissenting).

I think that the patent sued on involves patentable novelty and should be held valid. The patentee has done more than merely substitute materials in the manufacture of a megaphone or dunce cap. He has devised a traffic marker of great utility, which has met a real need and which has solved a problem which other attempts had failed to solve. The fact that it is a combination of old elements does not detract from its patentability, for these have been brought together in the production of a new and useful result, viz., a traffic marker which, because of the resiliency of the materials of which it is made and the shape which is given it, can be used quickly, successfully and safely as a marker for the guidance of traffic in the highways of the country. None of the devices shown in the prior art were successful or could be successful in solving the problem thus presented. In addition to the presumption of validity resulting from the issuance of the patent by the Patent Office, there is the presumption arising from the fact that the device achieved immediate commercial success as soon as materials were available for its manufacture after the war and was widely used throughout the country. The president of the infringing company was so impressed with it that he sought to buy an interest in the patent or obtain sales rights thereunder and, when unsuccessful in this, made a minor change in the shape of the base of the device in an evident attempt to avoid infringement, obtained a Canadian patent on the change thus made and applied for a patent thereon in the United States.

Very much in point here is the decision of this court in Watson v. Heil, 4 cir., 192 F.2d 982, where we reversed a decision denying validity to a patent for a grocery cart with nesting baskets and sent the case back for further hearing in which the patent was sustained. In point, also, is the decision of this court in Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 cir., 40 F.2d 910, where we upheld the validity of a patent on a hand scale for weighing automobile trucks, although all of the elements used in the scale were old in the art, quoting from Mr. Justice Bradley in Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, that "It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention".

The device of the patent seems obvious, now that the inventor has produced it, but as said by Mr. Justice McKenna in the oft-quoted passage from Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527: "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

The invention filled a want in the industry and entered into immediate use when placed on the market by the plaintiff. Temco Electric Motor Co. v. Apco

**550**

Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Diamond Rubber Co. v. Consolidated Rubber Tire Co., supra; Pangborn Corporation v. W. W. Sly Mfg. Co., 4 cir., 284 F. 217. And in addition to this we have the presumption arising from the imitation of the patented article by the manufacturers of the alleged infringing device. As said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 280 F. 277, 281: "The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think."

I would sustain the validity of the patent.