**L. B. SMITH, INC., Plaintiff,**

v.

**Luther J. HUGHES, T/D/B/A Hughes Trailers, Defendant.**

**Civ. A. No. 25412.**

United States District Court
E. D. Pennsylvania.

Jan. 31, 1961.

C. Willard Hayes (of Cushman, Darby & Cushman), Washington, D. C., for plaintiff. George T. Mobille (of Cushman, Darby & Cushman) and Robert V. Smith (of Smith, Ristig & Smith), Washington, D. C., of counsel.

James C. McConnon, Philadelphia, Pa., and Henry N. Paul, Jr. (of Paul & Paul), Philadelphia Pa., for defendant.

Plaintiff sues for declaratory judgment of patent invalidity and noninfringement of its power-operated, removable gooseneck without liability for infringement of the Meadows patent owned by defendant. By its counterclaim, defendant seeks a judicial determination its Meadows patent covers all power-operated removable goosenecks which "lift themselves by their own bootstraps".

Plaintiff says its employees designed a different mechanism, working on a different principle involving interlocking the gooseneck and trailer while the latter is supported on the ground, and then raising the interlocked gooseneck and trailer to a towing position, by a radically different mechanism than that invented by defendant. Plaintiff also contends the evidence shows removable gooseneck couplings (or hitches) for low bed trailers operating on the identical principle as the patent in suit were old in the prior art (Mosling patents); and Meadows, the present patentee, did nothing but substitute a power-operated hydraulic cylinder-piston assembly for an old power-operated winch and cable.

1. Plaintiff, L. B. Smith, Inc., is a Pennsylvania corporation. Its business is the distribution of heavy construction equipment for some of the largest manufacturers of power-operated shovels, road machinery, bulldozers, earth-moving equipment, etc., i. e., for Thew Shovel Company, Euclid Road Machinery Company Division of General Motors, Iowa Manufacturing Company, and other manufacturers of construction equipment. It also designs and fabricates crushing and sand plant components, e. g., it also manufactures and sells equipment for the sand and gravel and quarry industries.[1] It manufactures and sells rigid and removable gooseneck type low bed trailers, and formerly manufactured office trailers. It has separate operations: the Contractors Machinery Division, the Crushing Plant or Quarry Division, and the Trailer Division.[2] Gross sales are around $5,000,000 per year, half of which is attributed to the Quarry Division and one million or more to the parts business. The overall trailer business in 1959 was approximately $400,000. Of this total, $230,000 gross sales were attributed to removable goosenecks.[3]

2. In 1956, plaintiff acquired the industrial trailer business of Mastercraft Trailer Co. of Middletown, Connecticut.[4] R. C. Smith, formerly in charge of that division at Mastercraft, went with the business and became Sales Manager of plaintiff's Trailer Division. At that time, plaintiff was not offering a removable gooseneck, but was offering rigid or fixed low bed trailers for carrying construction equipment ranging in capacities from 2½ tons to 100 tons.[5] In 1956, two companies were making removable gooseneck couplings for low bed trailers—Rogers Brothers Corporation of Albion, Pennsylvania and Talbert Trailers, Inc., of Lyon, Illinois.[6] The removable goosenecks of these companies were commercially satisfactory and were sold in large numbers.[7] Plaintiff's distributors wanted a removable gooseneck in plaintiff's line to offer to their customers, because of the safety factor and the saving in loading and unloading time effected by these constructions.[8] Plaintiff had to offer a removable gooseneck if it were to compete in the low bed trailer field.[9]

3. In 1957, when plaintiff decided to enter the removable gooseneck field, it attempted to acquire rights from some established manufacturer, rather than to

1. Tr. 49, 50.
2. Tr. 50.
3. Tr. 63.
4. Tr. 64.
5. Tr. 296.
6. Tr. 51; 296.
7. Tr. 298; 643; 302.
8. Tr. 51.
9. Tr. 51; 303.

spend time and money to design its own construction.[10] It acquired rights from Birmingham Trailer Manufacturing Company, but was unsatisfied with this particular design.[11]

4. Defendant, Luther J. Hughes, resides at Kenhorst, Reading, Pennsylvania and is trading and doing business under the name of Hughes Trailers at Kenhorst, Reading, Pennsylvania.[12]

5. As stated, plaintiff is a manufacturer and distributor of heavy machinery and equipment having annual sales totaling about $5,000,000.[13]

6. Defendant is an individual enterprise employing an average of between 13 and 15 persons engaged solely in the production of low bed trailers.[14]

7. Plaintiff and defendant are in competition in the production and sale of low bed trailers and removable gooseneck low bed trailers.[15]

8. Defendant is the owner, by written assignment dated March 24, 1956, of United States Letters Patent No. 2,545,584 issued under date of March 20, 1951, hereinafter called "the Meadows patent" covering a heavy duty trailer and tractor hitch.[16]

9. Defendant notified plaintiff of the Meadows patent and of infringement thereof by plaintiff prior to the filing of this civil action.[17]

10. Plaintiff's Trailer Division Sales Manager, R. C. Smith, visited defendant on March 15, 1957. They talked license. No decision as to granting license rights were reached at this meeting, but at a subsequent meeting on July 15, defendant refused to grant a license, but offered to sell his trailer business for $300,000.[18] Plaintiff declined this offer.[19]

11. Plaintiff then determined to design its own removable gooseneck; it procured copies of many prior patents so a removable gooseneck might be designed without infringing on any prior patents.[20] The designing work was done by R. C. Smith and Elmer Benson; the latter had been hired August 1, 1957 as a stress engineer, but was put on the removable gooseneck design almost immediately.[21] Smith and Benson tried to stay as far away from any existing patented designs as possible.[22] By November, 1957, the designing work was completed and drawings were taken to plaintiff's patent attorney, Middleton.[23] He thought the design was good and did not infringe any existing patents.[24] He prepared and filed an application for a patent on this development, Serial No. 713,858, filed February 7, 1958.[25] A pilot model of the low bed trailer and removable gooseneck was built and was demonstrated in January, 1958 in Chicago at the Associated Equipment Distributors Annual Convention.[26] The pilot model was demonstrated to the Court during the trial, is shown in the photographs,[27] and in a motion picture film.[28] Plaintiff engaged in commercial production and sales followed.

12. On August 1, 1958, defendant's patent attorney, Smiley, wrote plaintiff a letter[29] charging plaintiff's hydraulically operated removable gooseneck hitch infringed defendant's '584. De-

10. Tr. 52.

11. Tr. 303–4.

12. Comp. par. 2; Ans. par. 2.

13. Tr. 50.

14. Tr. 842.

15. Tr. 793.

16. Px. 1; Px. 23.

17. Tr. 54; Comp. par. 6; Ans. par. 6.

18. Tr. 305.

19. Tr. 66.

20. Tr. 306.

21. Tr. 306.

22. Tr. 309–10.

23. Tr. 308.

24. Tr. 309.

25. Px. 3.

26. Tr. 310.

27. Px. 6a–6m.

28. Px. 22.

29. Px. 14–H.

fendant denied infringement.[30] Numerous letters were dispatched by defendant's patent attorney to customers and prospective customers of plaintiff.[31] These letters to customers charged the plaintiff's L. B. Smith, Inc., hydraulically operated goosenecks infringed the patent in suit and threatened that defendant would "proceed with any legal action necessary to protect their rights against infringement and to enjoin use of the trailer without proper compensation".

13. A conference was arranged between plaintiff and defendant at plaintiff's place of business at Camp Hill, Pennsylvania on September 11, 1958.[32] Defendant brought one of his tractor-trailers equipped with his removable gooseneck hitch, and both plaintiff's and defendant's devices were demonstrated, side by side, at this time for comparative purposes. At the conclusion of the demonstration, defendant Hughes was heard to remark to the effect, "There's no comparison. Let's go home." [33] However, the conference was continued in the office of plaintiff's Vice President, E. A. Woolford. Mr. Ernie Adamson, attorney for defendant Hughes, asked Woolford whether he wanted to discuss licensing the patent or selling defendant's entire business to plaintiff L. B. Smith, Inc., but Woolford stated he was not interested in buying, only in acquiring a license.[34] No agreement was reached at the September 11 meeting. The present action for declaratory judgment was filed on October 9, 1958, seeking a judicial determination of the controversy, as plaintiff believed it was being damaged by defendant's threats to its customers.

14. Meadows, the inventor of the patent in suit, who testified at the trial, was Superintendent of the Equipment Division for Arlington County, Virginia, at the time the invention was made, having supervision of maintenance, repair, purchase, etc. of all equipment including vehicles of all kinds owned by the County.[35] Prior to the invention of the patent in suit, he made an earlier development in low bed trailers and couplings.[35a] This patent shows a low bed trailer having a tongue 26 adapted to be lifted from the ground at its forward end and attached to the rear end of a towing vehicle, as shown in Fig. 1. The lifting movement was effected by cables 58 and 59 (Fig. 3) extending from hydraulic cylinders rearwardly over pulleys 53 and 54 and downwardly to a pair of links, to be connected to a cross-bar secured to the tongue, as shown by Figs. 4 and 6. After the hydraulic cylinders and pistons lifted the tongue to its upper position, a pin 29 was extended through an opening 50 in the hitch pin 32 (Fig. 5) at the rear end of the truck frame, behind the rear axle. Thus the weight of the load on the low bed trailer was borne by the hitch pin 32 at the forward end, connected to the rear end of the truck frame. The construction was satisfactory for loads up to 15 tons but when heavier loads were carried, the weight to the rear of the truck frame tended to lift the front wheels from the ground and made steering difficult or, at times, impossible. In order to reduce the expense involved in renting low bed trailers for hauling construction equipment owned by the County, and to provide low bed trailers which could be loaded over the front end, Meadows in 1945 designed and built two tag-along trailers of the type shown in his 2,449,947, dated September 21, 1948.[36] These trailers were adapted to be connected to the rear end of a towing truck. Hydraulic cylinder-piston assemblies mounted on the truck were connected through cables to links adapted for attachment to the front end of the trailer so that the trailer could be lifted into towing position and connected to the

30. Tr. 254.

31. Tr. 55, 68, 69; Px. 14b, 14c, 14d, 14e, 14f, 14g, 14a.

32. Tr. 315–18.

33. Tr. 315–16; 455.

34. Tr. 455.

35. Tr. 379, 380.

35a. As shown in his patent No. 2,449,947, Px. 4 (Item 4); Tr. 383.

36. Tr. 382–3.

truck at the rear end of the frame.[37] The hydraulic cylinders, cables and links served to raise and lower the front end of the trailer between loading and traveling positions and permitted disconnection of the truck from the trailer for loading. This arrangement was satisfactory for relatively light loads.[38] But, as just stated, when heavy loads were placed on the trailer, the weight, bearing on the rear end of the truck frame behind the rear axle tended to lift the front wheels of the truck from the ground making steering difficult or impossible, thus placing a limitation on the capacity of the loads carried by the trailers.

15. Meadows was familiar with fixed gooseneck couplings for low bed trailers and the advantages resulting from their use in applying the load ahead of the rear wheels of the truck or tractor, yet he did not like these constructions because the trailers could not be loaded from the front end.[39] During prosecution of the application which resulted in his first patent 2,449,947, the Mosling patent 2,325,869, was cited by the Patent Office, showing a removable gooseneck. Mosling showed such a construction would be practical.[40] Meadows then developed the removable gooseneck of the patent in suit 2,545,584, substituting for the mechanical cable and winch arrangement of Mosling, hydraulic cylinders and pistons and an appropriate bell crank and lifting arm mechanisms.[41] It appears he got the idea of using hydraulic cylinders from his own first patent and from other trucks, tractors, and pieces of heavy equipment then in use, from bell cranks and linkages of the type shown, and from trucks and a number of other pieces of equipment.[42] He concluded hydraulic actuating means for the coupling of the trailer to the gooseneck would be better than the use of cable and winches.[43]

16. Two removable gooseneck hitches were made under the supervision of Meadows at the Arlington County Property Yard for the County Government in accordance with his patent 2,545,584 in suit.[44] These removable goosenecks work satisfactorily and are still in operation, but the invention was not immediately adopted commercially; and, at first, made no impact on the industry.[45] Meadows endeavored to sell rights under his invention to the largest manufacturers of low bed trailers in the country, including Rogers Brothers Corporation, Dorsey Trailer Company and LaCrosse Trailer Company.[46] Although Rogers Brothers sent several men to Washington to examine the Meadows trailers, they acquired no rights. The other concerns to whom Meadows offered his construction also were not interested. In 1954 Meadows called on defendant Hughes at his plant in Reading and showed his drawings.[47] Later, a verbal understanding was reached that Meadows would work with Hughes in building one or more goosenecks and, if they proved a success, an agreement for compensation would be executed.[48] Meadows worked with Hughes in completing two and partially completing a third trailer through a period of about a year.[49] Meadows made twelve trips to Reading,[50] but received no compensation for his time and efforts. Finally, Meadows accepted $1,500 for an outright assignment of his patent on March 24, 1956. The assignment[51] also included the entire right, title and interest in and to future improvements of the invention disclosed in the patent. The $1,500 figure was a compromise between $2,000 which Meadows

37. Tr. 383–4.
38. Tr. 385.
39. Tr. 385.
40. Tr. 386.
41. Tr. 386.
42. Tr. 387.
43. Tr. 393.
44. Tr. 393–4.

45. Tr. 396.
46. Tr. 396.
47. Tr. 397.
48. Tr. 398.
49. Tr. 862.
50. Tr. 398–99.
51. Px. 23.

had understood he was to receive and $1,000 which Hughes offered him at the outset of the meeting on March 24, 1956.[52] Meadows thought that, in addition, he would get some royalty when the devices were put on the market, but after the assignment was executed and a request for such royalties were made, Hughes refused and inventor-Meadows never received any royalties.[53]

17. Defendant, Luther J. Hughes, did not testify at trial, although present in Court and there is no evidence as to the size of his business, annual volume of sales, or his net worth. Although there is no direct relevancy to the issues in suit, there is evidence when plaintiff's B. C. Smith testified on deposition that the operations of defendant were "a drop in the bucket" as compared to plaintiff L. B. Smith, Inc., he was referring to the entire business of L. B. Smith, Inc. and not merely to the business resulting from the sale of removable goosenecks and low bed trailers associated therewith. Plaintiff's sales of removable gooseneck low bed trailers in 1958 were 22; in 1959, 33, and in the first half of 1960, 6, with a dollar value of $134,000 in 1958, around $230,000 in 1959, and approximately $50,000 in the first half of 1960.[54] The sales figures of defendant, given by his office manager were: [55]

| Year | No. of Units | Gross Sales Value |
|------|--------------|-------------------|
| 1955 | 1 | $ 8,400 |
| 1956 | 6 | 41,500 |
| 1957 | 14 | 128,186 |
| 1958 | 9 | 79,425 |
| 1959 | 14 | 129,806 |
| | | $387,317 |

52. Tr. 400.

53. Tr. 401.

54. Tr. 57.

55. Tr. 841.

56. Tr. 632.

57. Px. 24.

58. Px. 25; Tr. 628-631.

59. Tr. 631.

Thus, through the end of 1959, defendant's total sales of these forty-four trailers amounted to $387,317, while plaintiff's amounted roughly to $364,000. Sales figures of other manufacturers were mentioned: for Martin, Fruehauf and Talbert but not placed in evidence, while those of Rogers Brothers Corporation were.[56] Rogers Brothers' production figures of removable goosenecks for the years 1950-1954 are 134; for 1955, 33; 1956, 46; 1957, 66; 1958, 46; and 1959, 55, for a grand total of 380 for the years 1950-1959.

18. At the time defendant entered the field of removable goosenecks in 1955 and 1956, Rogers Brothers Corporation was manufacturing and selling with success, a hydraulically operated removable gooseneck of the type shown in patent 2,590,210, H. L. Rogers, March 25, 1952,[57] and a cable and winch operated removable gooseneck of the type shown in patent 2,590,181, Keesler, March 25, 1952.[58] From 1950 to 1956, Rogers Brothers Corporation was the only concern selling a power-operated removable gooseneck, with the exception of La-Crosse Trailer Company, which offered one for a short time, but which was subsequently abandoned.[59] Rogers is the largest manufacturer of power-operated removable goosenecks in the country [60] and, combined with Martin and Talbert, sell the greater percentage of all detachable goosenecks sold today.

19. Rogers Brothers Corporation advertised its power-operated removable goosenecks extensively in the trade, distributed catalogs widely and had demonstration units touring the country as part of their sales and publicity program.[61]

60. Tr. 632.

61. Tr. 633-643. PX. 27-33 are representative of its catalogs, pamphlets, mailing pieces and magazine advertisements. The Meadows patent, having a filing date ahead of the Rogers Brothers development gave defendant an entree into this field without danger of infringement of any patent rights of Rogers.

20. The evidence is vague in the record of the existence of a problem in the art, involving the structure in suit, or attempts by other workers in the field to provide solutions for such problems without success. There is no evidence of immediate commercial acceptance of the apparatus covered by the Meadows patent or that it supplanted other constructions on the market. On the contrary, except for the two units made by the patentee for Arlington County, Virginia, the invention lay dormant for six or seven years, during which time the demand was supplied by other types of removable goosenecks, notably, Rogers et al. When introduced to the market by defendant, the patented gooseneck did not supplant those being sold by others and did not meet with substantial commercial success or enjoy outstanding commercial acceptance.[62]

LEAHY, Senior District Judge.

██ Validity of the patent in suit is tested on an evaluation of the inventor's contribution to the art, and by comparison of the patented structure with prior art. 35 U.S.C.A. § 103.

### Meadows '584

Meadows discloses a detachable gooseneck which is specifically different from the prior patents in the mechanism employed to lift the trailer into interlocking relationship with the gooseneck. The mechanism includes a nose block 19 having a projection at the rear end of the gooseneck adapted to be received in a cross channel and socket in the trailer. A wedge-shaped guide channel 18 in the forward end of the trailer receives the nose block 19 and guides the same rearwardly toward the cross channel 20 and socket 21 when the tractor with the gooseneck in the lowered position is backed up toward the trailer for a coupling operation. A lifting arm or bar 39 carried by bell crank levers 34 pivotally mounted in the gooseneck is actuated by a pair of hydraulic rams receiving fluid under pressure from an engine-driven pump on the tractor. The lower end of the lifting bar or arm 39 carries trunnions 42 adapted to be received in hooks 22 on the end of the trailer, to lift the trailer into interlocking relationship with the underside of the gooseneck (Fig. 3), when the bell cranks and lifting arm are swung past dead center. The parts are maintained in interlocked relation by a latch 45. Latch 45 is described as a "safety locking mechanism for the bell cranks when they are in their lifted position, to avoid any possibility of dropping the trailer while it is in transit." [63]

In the Meadows trailer, the gooseneck is not interlocked until the trailer has been raised to the position shown in Fig. 3 in engagement with the underside of the gooseneck. Prior to this operation, the trailer is either supported on the ground or hanging freely from the lifting arm, during the lifting operation. That the interlocking relationship with the gooseneck is effected only after the lifting operation, is specified in the patent.[64]

### Prior Art Relevant But Not Decisive

Bevan 2,481,898 (9/13/39) shows a hydraulic cylinder 14 mounted on a towing truck for raising the truck body to a dumping position and for lifting the

---

62. Removable gooseneck hitches or couplings for low bed trailers were not new when Meadows made the invention . of the patent in suit (application filed August 31, 1949). Since no evidence was presented, taking his date back beyond his filing date, this must be considered his invention date for the purposes of this case. Removable gooseneck construction for low bed trailers are shown in the patents to Mosling 2,312,769, March 2, 1943; 2,325,869, August 3, 1943; 2,331,713, October 12, 1943; Talbert 2,489,112, November 22, 1949 (filed February 24, 1947), and Martin 2,663,574, December 22, 1953 (filed February 13, 1945).

63. Spec. col. 4, line 14 et seq.

64. Col. 1, lines 20, 21, 47 and 48; Col. 2, lines 50, 51; Col. 3, line 37 et seq.

trailer front into interlocking relation with the frame. Lifting is by a cable 28 running from the front end of the truck body down under a sheave 47, to the rear over a sheave 45, down under a sheave 26 on the trailer, and back up to a connection at 46 with the truck frame. A coupling 24 of the trailer is to be connected to a pin carried by the truck frame. When the dump truck is raised by the hydraulic cylinder 14, motion is transmitted through the cable to lift the trailer into a position where it may be interlocked with the truck frame.[65]

Martin 2,663,574 (12/22/53) has a removable gooseneck coupling for low bed trailers having a hydraulic motor 6 mounted entirely within the gooseneck and connected through a lever 4 to a foot 4a, bearing against the truck frame to support the gooseneck in the desired elevation for alignment with the trailer frame so the gooseneck may be coupled to the frame by a slip joint. Coupling elements 12 are received in sockets 8 in the gooseneck when the parts are thus brought into alignment. The relevancy of Martin indicates there is no novelty in the idea of placing the hydraulic piston-cylinder assembly as claimed by Meadows directly in the gooseneck.[66]

Townsend 2,431,436 (11/25/47) and Martin 2,441,710 (5/8/48) both show folding goosenecks adapted to be moved from an up and forward extending position where they are connected to the fifth wheel of a tractor, to a downwardly and forwardly inclined position, supported upon the ground, where they serve as loading ramps for trailers. Both Townsend and Martin goosenecks are shifted from one position to the other by hydraulic motors and ground-engaging feet are actuated by hydraulic motors.[67]

Erickson [68] 2,210,907 (11/13/40), Williams [69] 2,375,970 (5/15/45), and Wright [70] 2,495,493 (1/24/50) all show draw bars or couplings secured to tractors, etc., with hydraulic motors in cylinder-piston assemblies mounted on the tractor for raising and lowering the draw bars or couplings and for raising and lowering equipment thereto attached. Hunter [71] et al. 2,025,285 (12/24/35) and Whittier [72] 2,567,534 (9/11/51), filed 1946, both show earth-moving equipment such as scrapers, graders, etc., all having gooseneck-shaped frames that can be connected to forward elevated ends to towing tractors with hydraulic motors mounted on the goosenecks for controlling the positions of the scraper buckets, blades etc. Likewise, Wood [73] 2,339,039 (1/11/44) and 2,350,141 (3/30/44) show hydraulic motors for dump trucks, etc.: both show garbage semi-trailers with gooseneck type frames wherein the hydraulic cylinders for dumping the trucks are mounted in the gooseneck portions of the frames. '141 has in addition hydraulically operated ground-engaging feet to support the truck frame when dumping. Another Wood 2,332,961 (10/26/43) shows a conventional dump truck hoisting arrangement where a hydraulic cylinder 20 and piston 28 operate through a bell crank lever 44 for raising the body.[74]

■ Meadows file wrapper [75] of the patent in suit for '584 discloses (through-

---

65. Tr. 468, 469.

66. Tr. 468, 471.

67. Tr. 471–73.

68. Tr. 473.

69. Tr. 474.

70. Tr. 475.

71. Tr. 476.

72. Tr. 477.

73. Tr. 479–81; Px. 5.

74. Figs. 2 and 3: Tr. 481–2.

75. Px. 2 (Meadows file wrapper) shows on the first action, claim 1 was rejected "as not patently defined over" Talbert 2,489,112. The claim called for *"power operated means,* housed in the gooseneck carrying lifting means connected and arranged to lift the forward end of the trailer into the interlocking engagement with the gooseneck." After rejection the claim was amended by inserting a limitation to the "arm" (instead of "means" broadly) connected and arranged to perform the lifting function. Then the claim was allowed.

out prosecution) the prior patents to Mosling and the other prior art patents, now relied on here by plaintiff, were not cited by the Examiner—with the exception of Talbert 2,489,112 (11/22/49). On these patents plaintiff argues Meadows invention was not involved in the mere substitution of a hydraulic motor for the power operated winch and cable, for example, of Mosling. Moreover, presumption of patent validity is weakened by an anticipating patent not considered by the Patent Office. Moore v. Jack P. Hennessy Co., Inc., D.C.N.J., 187 F.Supp. 868.

### Meadows Patent in Suit in Juxtaposition to Mosling 2,325,869

It was said at trial the patent in suit is for a so-called "bootstrap" operation—both the gooseneck and trailer platform are lifted when the gooseneck is operated. The essential elements of the gooseneck-trailer are: 1. the gooseneck; 2. a fifth wheel connection between the forward end of the gooseneck and the towing tractor; 3. hydraulic pistons and cylinders mounted in the gooseneck and powered by a hydraulic pump unit on the towing tractor; 4. a lifting arm which cooperates with hooks on the front end of the trailer; 5. "bell crank" levers which transform the hydraulic pistons into lifting movement of the lifting arm; 6. a nose block on the rear end of the gooseneck which cooperates with a guiding channel on the forward end of the trailer; and 7. a locking latch mounted on the gooseneck so as to lock the gooseneck and trailer in the raised position.

Defendant's *Meadows* is a combination to raise and lower the trailer. The operation is this: the trailer is loaded, say, with heavy duty road machinery or large earth-moving equipment; the tractor is backed to bring the gooseneck in contact with the trailer at a guide channel; the nose block engages the guide channel and, as the truck slowly moves backward, it is guided into interlocking engagement with the rear of the channel; then the lifting arm is brought into engagement with the hooks at the front end of the trailer and the hydraulic pump is operated to force out the hydraulic pistons which, in turn, rock the bell cranks forwardly and raise the lifting arm and trailer. The trailer is thus raised until it is interlocked with the underside of the gooseneck, at which time the locking latch drops down to engage the bell cranks and locks the combination in the raised position.

*Mosling* teaches this combination of elements operates to raise and lower the trailer of a field gun *as well as other types of trailers*. The operation of Mosling is the same as Meadows—it starts after the trailer is loaded, e. g., heavy duty equipment. Loading can be over the front end for optimum convenience and safety. After loading, the tractor and gooseneck are back into contact with the trailer at the guide channel, i. e., the nose block engages the guide channel and slips into interlocking engagement with the rear of the channel. Then, the lifting arm catches the hooks on the front end of the trailer and the winch unit is operated to rise in the cable which, in turn, raises the lifting arm and trailer. The trailer rises until it is firmly contacted with the underside of the gooseneck. The locking shaft on the gooseneck engages a clamping member on the trailer and the combination locks the entire mechanism to a raised position. The reverse procedure is the same.

Comparison of *Meadows* (patent in suit) with *Mosling* shows Meadows combined a number of old elements functioning and accomplishing the same result. At best, *Meadows'* advance in the art was to substitute hydraulic means for *Mosling* mechanical means. Mere substitution of a recognized source of power for another source of power is not always, in the mechanical art, a patentable distinction. It could be, but it is not in the instant suit.

A panoramic comparison of each claim of the Meadows patent, alleged to be infringed by plaintiff's structure, to Meadows' gooseneck and trailer combination

with Mosling's gooseneck and trailer combination, would suggest Mosling anticipates Meadows. Parallelism of elements and function are set out in Appendix I.

### An Apposite Authority and the Law of the Third Circuit

Among the 480 critical cases which make up the vast complex of patent law, it is rare a judge finds another case so closely in point as to the one he happens to have *sub judice.* Here, there is one. In Willett Mfg. Co. v. Root Spring Scraper Co., 6 Cir., 55 F.2d 858, the issue involved the substitution of hydraulic means for mechanical means for operating a machine in the construction equipment field. The invention was concerned with the rise of hydraulic means for raising and lowering the blade of a road scraper as a substitute for a mechanical means function. Portions of Judge Hickenlooper's opinion could be incorporated in this memorandum with little change. (p. 860)

■■ But taking a fresh look at the facts of the case at bar, a century old citation shows invention does not exist unless the subject matter discloses more ingenuity and skill than that possessed "by an ordinary mechanic"; [76] and, as recently as Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, it was again repeated that where the patentee adds nothing to the total stock of knowledge but merely brings together segments of prior art, and claims them in congregation as a monopoly, he has no valid patent.[77]

■ This master principle has been consistently endorsed by and in the Third Circuit. Dollac Corporation v. Margon Corporation, 3 Cir., 275 F.2d 202; [78] Crosley Corp. v. Westinghouse Electric & Mfg. Co., 3 Cir., 152 F.2d 895, 903; Zephyr American Corporation v. Bates Manufacturing Co., 3 Cir., 128 F.2d 380, 385; and, in the district courts, Sperry Rand Corporation v. Ronson Service, Inc., D.C.E.D.Pa., 159 F.Supp. 3, 5; Nachtman v. Jones & Laughlin Steel Corporation, D.C.W.D.Pa., 134 F.Supp. 392, 404; and Delaware's Berghane v. Radio Corporation of America, D.C.Del., 116 F.Supp. 200, 203, 210. Defendant devoted in briefs and argument a goodly portion to demonstrate the Third Circuit has laid to rest the "flash of genius" test of invention.[78a] The "flash of genius" formula is not in issue in the case at bar. At least there is no thought of applying it. The Patent Act of 1952, 35 U.S.C.A. § 1 et seq., neither raised nor lowered the standard of invention and did not change the basic tests for determining patentability.[78b] Validity is determined solely upon the *objective basis of whether the subject matter would have been obvious to one skilled in the art to which the invention pertains at the time it was made.*

■■ True, also, validity attaches to a patent or is theoretically assumed by 35 U.S.C.A. § 282. But, the presumption is rebuttable. This cannot be rebutted by a prior patent already cited by the Patent Office against an application and rejected; but, the primary reference, here,—which we have for the first time—of Mosling 2,325,869, was not cited by the Examiner during prosecution

76. Hotchkiss v. Greenwood, 1850, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683.

77. Ibid., 340 U.S. at page 153, 71 S.Ct. at page 130.

78. Ibid., 275 F.2d at page 204: "more ingenuity than that of a mechanic skilled in the art".

78a. R. M. Palmer Co. v. Ludens, Inc., 3 Cir., 236 F.2d 496, 500 (*en banc*); Hartford National Bank & Trust Co. v. E. F. Drew & Co., 3 Cir., 237 F.2d 594, 596.

Cf. "The sensitive observation of Judge Learned Hand" in Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530.

78b. Most recently, Barrott v. Drake Casket Company, D.C.W.D.Mich., 187 F. Supp. 284; Interstate Rubber Products Corp. v. Radiator Specialty Co., 4 Cir., 214 F.2d 546; General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912; Belden v. Air Control Products, D.C. W.D.Mich., 144 F.Supp. 248, and other authorities therein cited.

of Meadows' patent, nor were any of the other prior patents now relied upon by plaintiff—except Talbert 2,389,112. "The presumption of validity is inoperative" against prior art not cited by the Examiner. Baldwin-Lima-Hamilton Corporation v. Tatnall Measuring Systems Co., D.C.E.D.Pa., 169 F.Supp. 1, 12; Moore v. Jack P. Hennessy Co., Inc., supra.

### If Meadows' Patent Valid Infringement Exists

A panoramic and analytical comparison of plaintiff's accused device, which was manufactured and constructed in accordance with plaintiff's Smith & Benson's Patent Application Serial No. 713,858 which stands allowed by the Patent Office, with the claims of defendant's Meadows patent, shows a conscious parallelism, as laid out in Appendix II.

Plaintiff argues its gooseneck hitch does not duplicate the structure and operation of Claim 1 of defendant's patent because in the accused structure the gooseneck and trailer are "interlocked" prior to lifting the trailer from the ground. But this is to say once interlocking occurs before lifting, it does not mean "interlocking" in another way, after lifting. The distinction is too fine. The power-operated means of plaintiff's gooseneck utilizes hydraulic power housed in the gooseneck and a lifting arm depending from the gooseneck which lifts the front end of the trailer. In short, there is "interlocking" as lifting occurs; it is, also, in *"interlocking engagement with the gooseneck"*. As

Meadows' Claim 1 provides for an "interlocking engagement", it is implicit Claim 1 includes "interlocking engagement" before lifting.[79] As stated by plaintiff's expert Wood, the engagement of plaintiff's lifting arm with the front of the trailer is executed the same as Meadows', so little is left to distinguish plaintiff's structure from defendant's patent[80] and Claim 1.

Likewise the operative features of Claims 3, 4, 5, 7 and 9 appear in plaintiff's gooseneck hitch.

Meadows' Claims 3 and 4 refer to the guiding channel in the platform of the trailer which joins the projecting nose block at the rear end of the gooseneck, i. e., it guides the gooseneck into interlocking engagement with the trailer. The platform of the Smith-Benson trailer has a guiding channel, and its nose block engages the channel for guiding the gooseneck.[81] Benson, one of the designers of the accused structure, preferred "restrict" to "interlock" to describe the joining of the gooseneck with the trailer in Meadows' patent (Fig. 6). This is merely a semantic difference. Benson did state his and Smith's gooseneck is guided into locking engagement with the trailer when the truck is backed into towing position as shown in Fig. 6 of his application.[82]

Claim 5 calls for a hydraulic mechanism in the gooseneck to engage the front end of the lowered trailer when the truck is backed to a coupling position. This is shown in Fig. 6 of the Smith and Benson application when the lifting hook 63 en--

79. Plaintiff's expert Wood said the Meadows' gooseneck is "interlocked" with the trailer in Fig. 6 while the trailer is on the ground. See, too, Px. 1, col. 2, lns. 41–46. The other claims likewise showing plaintiff's "interlocking": see Claims 3, 4, 9.

80. Wood, Tr. 553,674:
   Wood says Meadows calls for "two interlocks at two different times"—the first when the trailer is on the ground (Fig. 6 of Meadows) similar to the Smith & Benson application (Fig. 6); and the second when the trailer is lifted

to towing position in Meadows (Fig. 3) and in Smith & Benson (Fig. 3).
   Wood, Tr. 553,674:
   The second interlocking in Meadows is by the passage of the bell crank and lifting arm (Fig. 3) and in the Smith and Benson structure this is done by locking lugs which pass through openings in the gooseneck when the trailer reaches the normal towing position (Fig. 3 of Smith & Benson Application).

81. Smith, Tr. 769–774.

82. Benson, Tr. 172.

gages the hook 68 at the front end of the trailer.[83]

Claim 7 speaks of "safety locking means in the gooseneck". This is to prevent accidental disconnection of the gooseneck and the trailer. The plaintiff's gooseneck has a safety locking means, e. g., locking members 80 holding the wedges 70 in place to prevent the trunnion 66 from becoming disengaged with the hook 68 at the front of the trailer.[84]

Claim 9 speaks of the lower end of the lifting bar as "trunnions" and defines "hook members" on the forward end of the trailer. R. C. Smith, one of the designers of plaintiff's gooseneck, states the lifting elements 66 on the lower end of plaintiff's hooks 63 act as trunnions; and the block element 68 at the forward end of the trailer has a hook-nose (Figs. 14 and 15 of Smith and Benson application) which engages the trunnions 66 to prevent forward disengagement of the gooseneck and the trailer.[85]

Defendant, at trial, attempted to bring forth evidence in a colorful background to suggest plaintiff deliberately appropriated the so-called advantageous features of the Meadows patent. The pointer was placed on:

Plaintiff's advertising of its removable gooseneck hitch as a "hydraulic lift" which is "contained in the gooseneck" and it can "lift itself by its own boot-straps";[86] plaintiff's attempt to appropriate the invention of the Meadows patent;[87] the trips of Smith and Benson to defendant's plant to study structure and operation of the Meadows gooseneck hitch;[88] plaintiff sought to copy defendant's structure as closely as possible without infringing;[89] the study by Smith and Benson of the Meadows patent in order to duplicate but not infringe;[90] and

plaintiff's rejection of. the prior art, but making its design conform to the Meadows patent;[91] and, finally, even after design and commercial production of the accused gooseneck, plaintiff still sought a license under defendant's Meadows patent.[92] While this evidence rendered a background music to plaintiff's infringement, I have not considered it controlling on the issue of infringement. I have looked only to the structures and the claims involved. Such objectivity is desirable.

■ As shown by the elaborate presentation in Appendix II, there is conscious parallelism between Meadows' and plaintiff's accused structure, even though constructed under the allowed Smith and Benson Application; and it is clear there exists structural and functional correspondence between Meadows' patent and plaintiff's accused device. Thus, if it be error to hold, as I have, Meadows is invalid, but that there is validity, then I would (I do) find infringement of Claims 1, 3, 4, 5, 7 and 9 of the Meadows patent; but, as suggested, plaintiff is not guilty of deliberate or willful infringement.

At the worst, plaintiff has infringed (as I have written at length) an invalid patent. On the evidence, the complaint for declaratory judgment is sustained and the Meadows patent in suit No. 2,545,584 is invalid. If, however, on appellate review, the decision should be otherwise, then infringement is present and a judgment should be entered on the defendant's counterclaim and a decree should be entered to defendant for an injunction, accounting and costs.[93]

On the precise holding, however, an order should be entered giving declaratory judgment to plaintiff.

83. Smith, Tr. 773–4.

84. Smith, Tr. 749.

85. Smith, Tr. 744.

86. Smith, Tr. 784–5.

87. Middleton, Tr. 257–259; Smith, Tr. 305–6, 317.

88. Woolford, Tr. 716–17.

89. Woolford, Tr. 718.

90. Smith, Tr. 338–341.

91. Middleton, Tr. 265.

92. Middleton, Tr. 267–70; Smith, Tr. 317.

93. Any consideration of an award for attorney's fees will be reserved and dependent upon the appellate determination of validity.