# HOWARD *v.* STILLWELL AND BIERCE MANU-
## FACTURING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF TEXAS.

No. 180.   Argued January 30, 1891. — Decided March 16, 1891.

The failure to note an objection to a deposition, based upon the form of the
commission or the manner of executing it, when the deposition is taken,
or to present the objection by a motion to suppress, or by some other
notice before the trial begins, will be held to be a waiver of it.

In an action to recover the contract price for putting up mill machinery,
anticipated profits of the defendant resulting from grinding wheat into
flour and selling the same, had the mill been completed at the date speci-
fied in the contract, cannot be recovered by way of damages for delay
in putting it up.

As a general rule, subject to well established qualifications, anticipated
profits, prevented by the breach of a contract, are not recoverable as
damages for such breach; but, where such profits, which would have
been realized had the contract been performed, and which have been pre-
vented by its breach, are not open to the objection of uncertainty or
remoteness, or where, from the express or implied terms of the contract
itself, or the special circumstances under which it was made, it may be
reasonably presumed that they were within the intent and mutual under-
standing of both parties at the time it was entered into, they are so
recoverable.

THIS was an action at law by the Stillwell and Bierce Manu-
facturing Company, an Ohio corporation, having its principal
place of business at Dayton in that State, against W. C. How-
ard, S. T. Stratton and J. Rauch, citizens of Texas, to recover
a balance due on a contract in writing entered into between
the parties hereto; March 23, 1885, for the reconstruction by
the company of a flour-mill owned by the defendants in Dallas,
Texas.

The contract provided, among other things, that the party
of the first part (the company) should reconstruct the mill of
the defendants, upon the roller system, by placing therein
certain specified machinery, and "all other machinery and
material necessary to erect and complete a flour mill of two

hundred barrels' capacity in twenty-four hours, according to plans to be made by the party of the first part, and to be placed by them in the mill-house to be built by the party of the second part in Dallas, Texas; party of the second part to furnish proper motive power to drive said machinery, and to extend engine-shaft into basement of mill-house to a point to be hereafter designated by party of first part, and not to exceed eight feet inside of basement wall. Party of the second part are to build all stone or brick foundations for machinery, and frame all openings in floor for packers, upright shafts, etc. The party of the first part agrees to have the mill completed and ready to run on or before July 15, 1885, provided party of the second part shall have mill-house ready by June 1, 1885. The said party of the first part guarantees that said mill when completed shall have a capacity for from two hundred or more barrels of flour in twenty-four hours; and that the result shall be equal to those of any of the roller or other modern systems of milling now in use in this country using the same grades of wheat. The said party of the first part shall perform all the millwright work, which shall be done in a good and workmanlike manner, and shall furnish all materials therefor, except such as are now in said mill and can be utilized, which may be used free of charge by said party of the first part; and the said party of the second part hereby covenants and agrees to pay the said party of the first part for said machinery, materials and labor the sum of seventeen thousand eight hundred and fifty dollars, as follows: $7000 cash on shipment of said machines, and $7000 in nine months from date of shipment of said machinery; $3850 in twelve months from date of shipment of said machinery. Party of the second part to keep the mill insured for the benefit of party of the first part as their interest may appear in case of fire, for which said party of the second part agrees to execute and deliver promissory notes to said party of the first part, dated time of shipment of machinery, bearing eight per cent interest, and secured as follows: To be satisfactory to the parties of the first part. No claims for damages shall be made by said party of the second part on account of delays incident to starting up. The

said party of the second part agrees to be responsible for any damage or loss by fire or otherwise after the machinery reaches Dallas.  The title of said machinery shall remain in and not pass from said party of the first part until the same is paid for and until all the notes, whether secured or unsecured, given therefor, are fully paid, and in default of payment, as above agreed, said party of the first part, or its agent, may take possession of and remove said machines without legal process."

The amended petition filed January 31, 1887, alleged that the plaintiff had performed its part of the contract; that the defendants had paid the first payment of $7000 at the time it fell due, but that they had not paid the two deferred payments which were then past due; and that they had refused to execute their notes for the deferred payments, according to the contract.  The plaintiffs prayed judgment for the sum of $10,850, the amount of the deferred payments, with eight per cent interest from May 26, 1885, the date of the shipment of the machinery.

The defendants filed a general denial, and also a plea in reconvention under the laws of Texas.  This plea denied that the plaintiff had performed its part of the contract, and sought a recovery from it of the amount of losses caused by such failure of performance.  The plea further alleged that the company did not have the mill completed within the time prescribed by the contract; that it did not furnish the machinery nor complete the mill within a reasonable time, or in a workmanlike manner as required by the contract, or furnish all the machinery contracted for; and that not only did the company delay the work beyond the contract time, but, in addition to such breach of the contract, it left the mill in so incomplete a condition that the defendants, at considerable expense to themselves, had to rectify the errors made by the company and complete the work as it had been contracted to be performed.  An amended plea continued as follows: "That there was a ready cash market in Dallas all this time for flour of the grade said mill would have made if constructed as plaintiff had agreed it should be, and defendants could have sold all of said flour it could have made during said unneces-

sary delays caused by plaintiff, viz. 200 barrels per day, and that plaintiff, by reason of the facts above stated, delayed defendants in the manufacture of said flour for sixty days, by which defendants lost a profit of $1 per barrel on 12,000 barrels of flour, or the sum of $12,000." The defendants accordingly demanded judgment against the plaintiff for the sum of $20,000.

The case came on for trial before Judge McCormick and a jury, on the 8th of February, 1887. On that day the defendants moved to suppress the deposition of William Odell, the foreman of the plaintiff company in the reconstruction of the mill, taken at Rochester, New York, for the purpose of showing that the delay of the plaintiff in completing the mill was caused by the defendants not having the building completed and ready for the machinery when the same was shipped. The record showed that the deposition was received and filed by the clerk of the court on the 22d of January, 1887, and was opened at the request of the attorney for plaintiff on the 5th of February of that year. This motion was as follows: "(1) Because said deposition is not certified·to by the officer who took the same, as required by law regulating the taking of depositions *de bene esse*. (2) Because no reasonable notice of the time and place of taking said deposition was given the defendants, as required by law regulating the taking of depositions *de bene esse*. (3) Because said deposition was not taken under authority of any *dedimus potestatem* granted by any court of the United States according to common usage." The court overruled the motion to suppress the deposition, and it was admitted and read in evidence; to which ruling the defendants excepted.

Afterwards, on the same day, the plaintiff moved to strike out so much of the defendants' plea in reconvention as seeks to recover the sum of one dollar per barrel on twelve thousand barrels of flour — that part quoted above —.which motion was sustained by the court, and the defendants excepted.

The plaintiff then introduced in evidence the contract sued on, and gave evidence tending to prove that the same had been complied with on its part. The defendants introduced

evidence tending to prove that the mill contracted to be built by the plaintiff for the defendants was not completed within a reasonable time, and was defectively constructed, and that the defendants were delayed in the manufacture of flour by reason of such delay and such defective construction. The defendants then offered, in writing, to prove by their own individual testimony, " that the market price per barrel for flour of the grade the contract sued upon stipulated for, between the middle of July, 1885, and the middle of September, 1885, was $5.00 per barrel; that during that period there was a ready cash market value in Texas for said grade of flour at $5.00 to $5.50 per barrel, and that the defendants could have sold 200 barrels per day during said period at $5.00 per barrel, and that upon each barrel so sold they would have realized $1.00 per barrel profit; that defendants had purchased and held on storage during said period a sufficient quantity of good wheat to have manufactured 200 barrels per day during said sixty days; that the market price during said period of such wheat was 60 to 70c. per bushel, and that the expense of turning such wheat into flour during said period was 80c. per barrel, and that defendants had in their employ all necessary laborers and skilled workmen to manufacture said wheat into flour, and were fully equipped with fuel and water and everything necessary to convert said wheat into flour, save and except the parts and pieces of said mill which plaintiff contracted to furnish in the contract sued on;" all of which above testimony was offered in support of that portion of defendants' plea in reconvention which sought to recover the profits on 12,000 barrels of flour. The court overruled the offer to prove all those facts, except the fact of the amount of wheat which the defendants had on hand during that period, to which ruling the defendants excepted. The plaintiff, in rebuttal, introduced the deposition of Odell, before mentioned, and other evidence tending to prove that the contract was complied with on its part. and that the building was not completed by June 1, 1885.

The jury returned a verdict in which they found for the plaintiff, on the contract, in the sum of $12,332.82, including

interest; and for the defendants in the sum of $875, as damages. Upon this verdict judgment was rendered in favor of the plaintiff and against the defendants for $11,457.82. A motion for a new trial having been overruled, the defendants sued out this writ.

*Mr. William Hallett Phillips* for plaintiffs in error.

*Mr. John Johns* for defendant in error.

MR. JUSTICE LAMAR, after stating the case, delivered the opinion of the court.

The errors assigned are as follows: "(1) There was error in sustaining the exception to that part of defendants' plea which sought the recovery of profits, and in rejecting defendants' offer of evidence in support of the plea. (2) The court erred in overruling the defendants' motion to suppress the deposition of Odell."

We will consider these assignments in the reverse order in which they are stated. The points made against the deposition of Odell by counsel for plaintiffs in error are, that it was not taken under any provision of the Revised Statutes of the United States, and that section 914, Revised Statutes, relating to the adoption by the federal courts of the forms and modes of proceeding in civil causes in the state courts, has no application to the present inquiry. It will be observed that these points do not relate to the competency of the witness whose deposition was taken, or to the admissibility of the evidence given in it, but are based solely on objections as to the form of the commission and the manner of taking the deposition. The record shows that the cause was at issue May 20, 1886. The commission to take the deposition of the witness Odell was signed January 4, 1887. Notice of the issuing of the commission was served on the defendants, and they filed cross-interrogatories in the premises, at the same time making the following waiver: "We waive copy of interrogatories and consent that commission may issue upon the original, direct

and cross-interrogatories. (Signed) Lindsley & McCormick, att'ys for defendants." As already stated, the deposition was filed in the case on the 22d of January, 1887, and opened, at the request of the attorney for the plaintiff, on the 5th of February, following. The motion to suppress the deposition was not made until the 8th of February, when the case came on for trial. In our opinion, the motion in this instance was too late. The counsel for defendants by waiving copy of the interrogatories, when notice of them was served upon them, and consenting to the issue of the commission, and practically uniting with plaintiff's counsel in executing it, by adding their own cross-interrogatories, and withholding the objections until after the trial had begun, must be considered as having waived such objections. It is the settled rule of this court that the failure of a party to note objections to depositions, of the kind in question, when they are taken, or to present them by a motion to suppress, or by some other notice before the trial is begun, will be held to be a waiver of the objections. Whilst the law requires due diligence in both parties, it will not permit one of them to be entrapped by the acquiescence of the opposite party in an informality which he springs during the progress of the trial, when it is not possible to retake the deposition. *Shutte* v. *Thompson*, 15 Wall. 151, 158 *et seq.; Mechanics' Bank of Alexandria* v. *Seton*, 1 Pet. 299, 307; *Winans* v. *New York and Erie Railroad*, 21 How. 88, 100; *York Company* v. *Central Railroad*, 3 Wall. 107, 113; *Doane* v. *Glenn*, 21 Wall. 33, 35; *Buddicum* v. *Kirk*, 3 Cranch, 293, 297; *Rich* v. *Lambert*, 12 How. 347, 354.

The remaining assignment of error, which relates to the striking out of so much of the defendants' plea as sought a recovery of profits, and the refusal of the court to allow any evidence to be introduced in support of it, needs no extended consideration. The question raised by it is, whether the anticipated profits of the defendants resulting from grinding wheat into flour and selling the same, had the mill been completed at the date specified in the contract, can be recovered by way of damages for delay in putting up the mill machinery. The authorities both in the United States and England are·

agreed that, as a general rule, subject to certain well-established qualifications, the anticipated profits prevented by the breach of a contract are not recoverable in the way of damages for such breach; but in the application of this principle the same uniformity in the decisions does not exist. In some cases of almost exact analogy, in the facts, the adjudications of the courts in the different States are directly opposite. The grounds upon which the general rule of excluding profits, in estimating damages, rests, are (1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote and not, as a matter of course, the direct and immediate result of the non-fulfilment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms. Sedgwick on Damages, (7th ed.,) vol. 1, p. 108 ; *The Schooner Lively*, 1 Gallison, 315, 325, *per* Mr. Justice Story ; *The Anna Maria*, 2 Wheat. 327 ; *The Amiable Nancy*, 3 Wheat. 546 ; *La Amistad de Rues*, 5 Wheat. 385; *Smith* v. *Condry*, 1 How. 28 ; *Parish* v. *United States*, 100 U. S. 500, 507 ; *Bulkley* v. *United States*, 19 Wall. 37. But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. *United States* v. *Behan*, 110 U. S. 338, 345, 346, 347 ; *Western Union Tel. Co.* v. *Hall*, 124 U. S. 444, 454, 456 ; *Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Howard*, 13 How. 307.

Cases illustrating various phases of this rule are numerous. One of the leading ones applicable to the case in question is

*Hadley* v. *Baxendale,* decided in the Court of Exchequer at Hilary term, 1854, 9 Exch. 341, 354, 356. In that case the plaintiffs, who were the owners of a flour-mill, sent a broken iron shaft to the office of the defendants, who were common carriers, to be conveyed by them to a manufacturer of such machinery, the broken shaft to serve as a model or pattern for the new one. The clerk of the defendants in their office was told that the mill was stopped, that the shaft must be delivered immediately and that a special entry should be made, if necessary, to hasten its delivery. The delivery of the broken shaft to the manufacturer was delayed an unreasonable length of time, in consequence of which the plaintiff did not receive the new shaft for some days after the time it ought to have been received, and they were, therefore, unable to work their mill from want of the new shaft, thereby incurring a loss of profits. It was held, however, that such loss of profits could not be recovered as damages in an action against the defendants as common carriers. Baron Alderson, in delivering the opinion of the court, laid down the rule of law as follows: " Now, we think the proper rule in such a case as the present is this: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. . . . It follows, therefore, that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably

contemplated by both the parties when they made this contract.  For such loss would neither have flowed naturally from the breach of this contract in the great multitude of such cases occurring under ordinary circumstances, nor were the special circumstances, which, perhaps, would have made it a reasonable and natural consequence of such breach of contract, communicated to or known by the defendants."

That case has been cited with approval and commented on by many of the courts of this country and by text-writers as well.  The general principles of it, we believe, are recognized and enforced, in most, if not all, of the several States.  A large number of the cases are referred to in Sedgwick on the Measure of Damages, vol. 1, 66–76, and 5 Encyclopædia of Law, pp. 13, 15, 32–4, and we shall attempt no extended review of them.  We shall content ourselves with a reference to a few of the leading ones most nearly similar to the one before us.

*Pennypacker* v. *Jones*, 106 Penn. St. 237, 242, was very much like the present case.  In that case the plaintiffs, who owned and operated a flour-mill in Philadelphia, entered into a contract with the defendants by certain of the terms of which the defendants were to place in their mill, within a specified time, machinery of a certain capacity, to make flour of a high grade.  The machines when furnished were found not to make a high grade of flour, and to be incapable of producing the stipulated number of barrels per day.  In an action for damages by the plaintiff for breach of the contract, it was held that the loss of possible profits, which might have been made if the mill had run properly, was not a proper subject of damages, for the reason that such damages were too remote and speculative.  In delivering the opinion of the court, Mr. Justice Green used this language: " It was no part of this contract that the plaintiffs should make profits, or even have the opportunity of doing so, by carrying on a business with the machinery which the defendants agreed to erect.  It is not like the sale of chattels or of land, where the difference between the contract value and the actual or market value of the property sold represents directly and immediately the measure of the party's loss or gain in the transaction.  There

the possible profit is the very object of the contract, and is necessarily in the contemplation of the parties. But when a machinist furnishes machinery to a mill owner it is no part of his engagement that a profitable business shall be carried on with the machinery furnished. Of course if it is defective he is responsible for the damage resulting directly from such defect; but that is a very different thing from the uncertain, remote and speculative profits which may or may not be made in the business to be done."

In *Callaway Mining and Manufacturing Co.* v. *Clark*, 32 Missouri, 305, which was an action for the seizure and detention of a steamboat by an attachment which was discharged, it was held that the measure of damages was only the actual damage sustained by the seizure, and that the jury could not be permitted to speculate as to what might or might not have been the earnings of the boat during the period of seizure.

*Blanchard* v. *Ely*, 21 Wend. 342, was an action for the price of a steamboat. The defence was that part of the machinery of the boat was unsound and imperfect, whereby considerable delay was caused; and that the loss of the probable profits that would have been made upon the trips that might have been run during the time the vessel was delayed on account of the imperfections in its construction, might be recouped in the action for the price of the boat. But the court held that such contingent profits could not be allowed. See also *Olmstead* v. *Burke*, 25 Illinois, 86; *Winne* v. *Kelley*, 34 Iowa, 339; *Howe Machine Co.* v. *Bryson*, 44 Iowa, 159; *Freeman* v. *Clute*, 3 Barb. 424; *Griffin* v. *Colver*, 16 N. Y. 489; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y. 205; *Brown* v. *Smith*, 12 Cush. 366; *Boyd* v. *Brown*, 17 Pick. 453; *Willingham* v. *Hooven*, 74 Georgia, 233; *Georgia Railroad* v. *Hayden*, 71 Georgia, 518; *Bridges* v. *Lanham*, 14 Nebraska, 369; *Houston & Texas Cent. Ry. Co.* v. *Hill*, 63 Texas, 381; *Smith* v. *Condry*, 1 How. 28.

The principles announced by the above cited authorities lead to the conclusion that the court did not err in striking out that part of the defendants' plea which sought to recover $12,000 as the profits expected to be derived from the sale of the flour

which they would have manufactured, and in excluding the evidence offered in support of the claim therein set up. Tested by them, such losses were, in our opinion, rather remote and speculative than direct and immediate, resulting from the breach alleged. There was no stipulation in the contract that the defendants should make profits on flour from the wheat ground up by the machinery which the plaintiff contracted to furnish and erect in the mill. Nor were there any special circumstances attending the transaction from which an understanding between the parties could be inferred that the plaintiff was to make good any loss of profits incurred by a delay in furnishing and putting up such machinery, according to the terms of the contract.

We see no error in the judgment of the court below prejudicial to the plaintiffs in error, and it is

*Affirmed.*