[No. 1796. Decided July 30, 1895.]

A. O. Benjamin, *Appellant,* v. The Puget Sound Commercial Company *et al., Respondents.*

ACTION FOR DAMAGES—NON-SUIT— BREACH OF CONTRACT—MEASURE OF DAMAGES—ANTICIPATED PROFITS.

In an action for damages for breach of contract to float a wreck, in which the only element of damages claimed was the difference between the value of a wrecked vessel and what she would probably

have been worth as a vessel afloat, the plaintiff should be non-suited when the evidence shows that the only contract entered into was that two tugs should use their best efforts, pulling together at high tide, to raise the wreck, for a fixed price for the pull, and that all chances of getting the vessel off were to be taken by plaintiff.

In an action for damages for breach of contract, there can be no recovery of expected profits when they are of an uncertain and speculative character.

*Appeal from Superior Court, King County.*

*Greene & Turner,* for appellant.

*Struve, Allen, Hughes & McMicken,* and *James Kiefer,* for respondents.

The opinion of the court was delivered by

Scott, J.—This is an appeal from a judgment of non-suit. In July, 1890, the bark Savona was wrecked on Dungeness Spit. About two weeks after that the appellant entered into an oral contract with respondents, each of whom owned a tug-boat, providing that said tugs should, at a certain time, proceed to where said bark was wrecked, and, at a time and in a manner specified, pull upon her for the purpose of moving her into deep water. The question to be determined is, whether the appellant had introduced any testimony entitling him to recover. The facts are substantially as follows:

The bark had been condemned as a wreck by the underwriters, and sold as such at public auction to one Bartlett, about a week prior to the making of the contract. The appellant purchased the wreck from Bartlett for $1,000, and put men at work in the hold and removed a large portion of the ballast. This work, and all other done upon the bark to prepare her for being pulled out of her bed and put afloat, was done prior to the making of the contract. In order to en-

gage the services of the tugs, appellant went to Port Townsend, where he first approached Captain Gove, of the tug Tyee. After talking with him the two saw Captain Struve, of the tug Wanderer. As to what was said relating to the contract, appellant testified as follows:

"I asked Captain Gove if he would agree to pull her off provided the Wanderer would ; if I could make a contract with them to pull her off for so much money, or in case they failed of course they got nothing. He said they would not pull in that way, but that they would go down and give me a pull, both vessels pulling at the same time, pulling together for five hundred dollars, and if I was sure about taking her off, of course that was something I knew better about than they did, but that they would render me the best service that they had. They would pull their very best, in a good and seamanlike manner, for the sum of five hundred dollars. It was specially agreed that they were to be there an hour before the tide was high."

And on cross-examination the witness testified as follows:

"He (Gove) stated he would see Captain Struve and see what he could do about it. I says, I would like to have you make the bargain to have you pull her off for so much.

"Q. You ask him to name the figures, what he would pull her off for — so much if he pulled her off, and so much if he did not? A. Yes, I did, in the course of the conversation, I think, say that I would give them five hundred dollars each if they would agree to pull her off. . . . He said he would not agree to any such thing; he would not agree to pull her off there. He would agree to go there and give me a pull with both boats together for two hundred and fifty dollars apiece.

"Q. Now, Captain Gove declined to take a proposition to go down there and pull and get paid five hundred dollars if they succeeded? A. Captain Gove.

says: 'I have got my hawser under the deck;' he says, 'It is more bother to me to take it up than it would be worth.' He says, 'I would not take it out for one hundred dollars.' He says, 'we will go and pull 'for two hundred and fifty dollars apiece.'

"Q. He refused to accept your proposition to go and pull for five hundred dollars if he succeeded? A. Yes.

"Q. And finally he said he would go and pull for two hundred and fifty dollars apiece and you take your chances? A. Yes, sir.

"Q. Now, in that connection, I understood you when you testified before, you stated that he said he would take two hundred and fifty dollars and both pull together on the vessel, and you take your chances of their getting it off; but that he would not go and pull for five hundred dollars contingent upon their getting off. Is that right? A. He would not take any chances on pulling it off. He didn't know anything about it. He says: 'You know all about it; you can take the chances.' He says, 'we will go and pull upon her for two hundred and fifty dollars apiece, pull all together and give you a good pull.'

"Q. And you take the chances? A. Yes. Take the chances of being able to pull her off — of the boats being able to pull her off."

The witness then testified that an arrangement was made with the two captains substantially on the terms above stated; that they were to go to Dungeness Spit on the afternoon of that day before high tide, and that they were to attach their hawsers to said bark and pull together at extreme high tide. He testified that they were from half an hour to an hour late in arriving, and that they did not pull together or pull properly, and that each of the tugs broke its hawser. It appears that the wreck was lying in several feet of water upon a sand and clay bottom, in which it had formed a bed. The depth and character of this bed were not described by any of the witnesses, and it does not appear that

any examination was made with respect thereto.   Appellant further testified that if the tugs had pulled according to agreement, he thought the bark could have been floated, and that before he could secure the services of other tug boats the tide, accompanied by heavy ground swells, drove the bark upon the shore with her stern upon the rocks in such a manner that it was impossible to thereafter float or save her; also, that if she had been floated she would have been worth about $30,000, and that was the amount he sought to recover in this action.   No proof was offered of any other element of damages, and the sole questions presented on this appeal are, were the damages which appellant sought to recover within the contemplation of the parties, and were said damages certain as the consequence of a breach of the contract.

A great many cases have been cited by appellant to support his contention that the value of the vessel afloat was the measure of his damages, but after an examination thereof we do not think they sustain his contention.   The general rule is that the injured party is entitled to recover all his damages, including gains prevented and losses sustained; but the damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract; that is, must be such as might naturally be expected to follow its violation; and they must be certain both in their nature and in respect to the cause from which they proceed.   *Griffin v. Colver*, 16 N. Y. 489 (69 Am. Dec. 718); 1 Sutherland, Damages, pp. 93, 94.

We think it appears by the testimony of appellant that the damages sought to be recovered in this action, were not within the reasonable contemplation of the contracting parties, as a consequence of a breach of

the contract, but were in fact expressly excluded therefrom. His own testimony shows that the masters of the tug boats positively refused to make a contract to pull off the wreck, and that they would not take any chances on pulling her off, and it thus appears that they meant to exclude from the agreement every contingency respecting the ability of the tugs to pull off the wreck. They were not willing to even risk their compensation upon such an uncertain result, much less can it be said that they intended to assume a liability to pay for the value of the vessel afloat, in case of a breach of the contract on their part. It is well known that for such salvage service the compensation usually awarded is a large portion of the value of the property saved. It is unreasonable to suppose that the respondents would contract with reference to such a liability, unless they believed that the wrecked vessel was in such a condition and so situated that she could be pulled from her bed with the combined power of the two tugs applied at the proper time and in the proper manner. That they at least had grave doubts of this is apparent from the language employed by the parties.

Under the contract in question, the only proximate damages within the contemplation of the parties which could arise from a breach of the contract would be the expenses incurred by the plaintiff upon the faith thereof, and possibly the difference, if any, in the value of the wreck immediately before and after the time fixed for the performance. But the evidence shows that all labor and expense incurred by the plaintiff was prior to the making of the contract in question and that no further expenses were incurred upon the faith of such contract. Indeed, plaintiff does not seek to recover any damages, except the dif-

ference between the value of the wreck and the value of the vessel afloat, and makes no contention that he has offered proof to sustain any other measure of damages.

The action upon the part of the appellant is substantially one to recover his expected profits from the transaction, and if it had proven successful the difference between the value of the vessel afloat and her cost as a wreck, with the expense incurred for her removal, would have represented his profit. In certain cases anticipated profits may be recovered in case of a breach of contract, but we have not been able to find any case where such expected profits were allowed where they were as uncertain and speculative as in this case. Of course, the power of the tugs may be said to have been known to the respondents, but it did not appear that any of the parties knew anything as to the character of the resistance to be overcome; the depth of the bed or cradle in which the bark lay was not shown, or the character of the earth, or its lateral thickness.

The law on this subject is aptly expressed by the supreme court of the United States in the case of *Howard v. Stillwell & Bierce Mfg. Co.*, 139 U. S. 199 (11 Sup. Ct. 500), in the following language:

"The grounds upon which the general rule of excluding profits, in estimating damages, rests, are, (1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote and not, as a matter of course, the direct and immediate result of the non-fulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a

part of the contract itself, nor can it be implied from its nature and terms."

We are of the opinion that the court rightly held when appellant rested, that there was no evidence which would warrant a recovery. Consequently the motion for a non-suit was well taken.

Affirmed.

HOYT, C. J., and ANDERS and GORDON, JJ., concur.

DUNBAR, J., dissents.