**RELIANCE MOLDED PLASTICS, INC.,**
**Plaintiff,**

**v.**

**JIFFY PRODUCTS, Defendant.**

Civ. A. No. 253–60.

United States District Court
D. New Jersey.
March 22, 1963.
As Amended April 1, 1963.

Mortimer Katz, Newark, N. J., for plaintiff, William R. Liberman, New York City, of counsel, for plaintiff.

Kaufman, Kaufman & Kaufman, Samuel Kaufman, Newark, N. J., Joseph

Hirshmann, New York City, of counsel, for defendant.

WORTENDYKE, District Judge.

In its complaint herein, plaintiff, a Rhode Island corporation, seeks a declaratory judgment that United States Patent No. 2,850,744 ('744), issued to Nika on September 9, 1958 upon application filed June 8, 1955, and owned by the defendant, is invalid and not infringed by the plaintiff. Jurisdiction is predicated upon the provisions of 28 U.S.C. §§ 1338 (a) and 2201.

The underlying justiciable controversy is disclosed in a letter, dated February 19, 1959, from the attorney for the defendant, accusing the plaintiff of infringement of the patent. The complaint charges that, since September 9, 1958, the defendant, with knowledge of the invalidity of the patent, has embarked upon a campaign of harrassment of the plaintiff and its customers, with the object of preventing further manufacture, use and sale of plaintiff's product, generally referred to as baby trainers.

Defendant denies that the patent in suit is invalid. By way of counterclaim, defendant alleges that, by written agreement, dated December 17, 1955, the defendant, as licensor under and owner of United States Patent No. 2,712,653 ('653), issued July 12, 1955, granted to the plaintiff a non-exclusive, non-transferable license thereunder to manufacture, use and sell "the specific and particular collapsible baby trainer represented by the sample trainer marked 'Exhibit A' (D-2 in evidence) and made a part of this Agreement, and illustrated in three blue prints marked Exhibits B, C and D, (D-3, 4, 5 in evidence) and hereby placed in the custody of Joseph Hirschmann, attorney for Jiffy Products, 1 West 64th Street, New York 23, New York." A copy of this license agreement is annexed to the counterclaim.

The counterclaim invokes the diversity jurisdiction of this Court. 28 U.S.C. § 1332(a) (1) and (c). Jiffy therein alleges that both of the parties to this action are bound by the license agreement, which provides (inter alia) that no other construction of a baby trainer shall be manufactured or sold by the plaintiff (Reliance) without written authorization from the defendant (Jiffy). Jiffy charges that Reliance is making and selling a baby trainer outside of the scope and in violation of the license agreement, whereby damage has resulted to the defendant. It is further alleged in the amended counterclaim that the baby trainer sold and offered for sale by Reliance has the same general appearance and functional and non-functional characteristics as the baby trainer originated and first put out by the defendant, with which it had become identified, and that Reliance thereby unfairly competed with the defendant in violation of the license agreement and by creating the likelihood of confusion in the trade. Jiffy seeks to recover upon this counterclaim damages for breach of the license agreement and for unfair competition, and prays for injunctive relief.

In its reply to Jiffy's amended counterclaim, Reliance pleads laches and estoppel; alleging that, from December 17, 1955 to May 24, 1960, Jiffy knew that Reliance believed that the baby trainer which it was manufacturing conformed with that contemplated by the agreement between the parties, and that it accepted the license fees provided for therein. Reliance contends that Jiffy permitted Reliance to incur expense for business development knowing that Reliance believed that its product was in accord with the agreement.

The issue of the validity of United States Patent No. 2,850,744 was decided against the patent at the conclusion of the evidence relating to that issue. There remained, therefore, the issues raised by the amended counterclaim and the reply thereto. At the conclusion of the evidence relevant to those issues, decision was reserved, and leave was granted to the parties to submit post-trial briefs with respect thereto.

The motion during trial to dismiss the counterclaim for impropriety of venue, 28 U.S.C. § 1391(c), was properly denied. The venue statute "does not limit the general jurisdiction" of the Court, which is derived from 28 U.S.C. § 1332, nor "withdraw any suit therefrom, but merely confers a personal privilege on the defendant, which he may assert, or may waive, at his election, and does waive if * * * he enters an appearance without claiming his privilege." Lee v. Chesapeake & Ohio Ry. Co., 1923, 260 U.S. 653, 655, 43 S.Ct. 230, 67 L.Ed. 443. "The jurisdiction of the federal courts— their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of litigants to confer. But the locality of a law suit—the place where judicial authority may be exercised—though defined by legislation relates to the convenience of litigants and as such is subject to their disposition. This basic difference between the court's power and the litigant's convenience is historic in the federal courts." Neirbo Co. v. Bethlehem Shipbuilding Corp. Ltd., 1939, 308 U.S. 165, 167, 60 S.Ct. 153, 84 L.Ed. 167. Plaintiff knew from the beginning that diversity of citizenship existed between the parties, having so pleaded in its complaint filed March 8, 1960. Defendant's answer, filed May 24, 1960, expressly admitted such fact. The counterclaim appended to said answer must be read in the light of such admissions; the ad damnum clause thereof seeking judgment for $100,000. The reply to this counterclaim, which was filed August 31, 1960, raises no issue of venue. Plaintiff's reply, filed July 27, 1961, to the amended counterclaim, is likewise silent respecting any contention that the cause of action set forth in the counterclaim is without proper venue; nor was any objection thereto made at the pretrial conference. The earliest motion attacking the venue of the counterclaim was made during the course of the trial. Plaintiff's reliance upon Orange Theater Corp. v. Rayherstz Amusement Corp., 3 Cir., 1944, 139 F.2d 871, for support of its contention that the issue of venue was not waived, is misplaced, as will appear from the language of Judge Maris, at p. 873: "That the defense (the motion to quash the service of process and dismiss the complaint) which it seeks to assert is not that of improper venue but rather want of jurisdiction of the court over the persons of the individual defendants." Plaintiff chose to initiate its lawsuit in this District, and by so doing has waived its right to assert improper venue against defendant's counterclaim filed pursuant to F.R.Civ.P. 13(a). Lesnik v. Public Industrials Corp., 2 Cir., 1944, 144 F.2d 968.

The '744 patent underlying the main cause of action in this case, which the Court has declared invalid, is characterized in its specifications as "a continuation-in-part of * * * co-pending application * * * filed September 2, 1950, now Patent No. 2,712,653, dated July 12, 1955." The general object of the claimed invention in the '744 patent is stated to be that of providing "a simple and inexpensive deflector for infants' trainer toilet seats and the like, which is pivotally mounted at the forward portion of the seat, and preferably in a suitable recess and can be rotated into operative upright position in which it is straddled by the legs of the infant; and in addition to its normal function, acts also to prevent the slipping of the infant from the seat, the deflector being rotatable in the opposite direction into inoperative position." Claim 1 of the patent reads: "A seat structure for baby trainers, comprising a seat having a central opening and a recess at the forward portion thereof communicating with said opening, and a deflector of approximately channel cross-section at the lower portion thereof when viewed in the upright position and pivotally mounted within the recess and adjacent to the forward end of the recess, said deflector being movable into upright position in which it extends a substantial distance above the top of the seat, the inner surface of the deflector then facing the central opening, the deflector being rotatable rearwardly into inoperative position within the recess, its outer surface

then providing a continuation of the upper seat surface substantially in the plane of the latter, the deflector being open at its bottom and presenting a smooth inner surface free of obstructions down to such bottom end when in upright position, whereby the flow of liquid down the inner surface of the deflector is unimpeded, the sides of the deflector being resilient and being sprung toward each other so as to frictionally engage the sides of the recess." [1]

Numerous prior patents were cited in the file of the patent in suit, extending from No. 1,623,994 issued to Buchsbaum April 12, 1927, through No. 2,717,717 issued to Busch September 13, 1955. Hughes, in United States Patent No. 2,494,813 issued January 17, 1950, upon application filed September 20, 1944, taught the provision of what is referred to in the specifications as "a permanently attached automatic urine guard or deflector which is in an operative position when the [infant's toilet] seat is in use and in an inoperative position when the seat is not in use." That a urine deflector was not a new feature of a child's toilet seat is disclosed by the Hughes specifications in the following language:

> "A necessary attachment for the prior art auxiliary seats when used for boys was the well-known urine deflector which was detachable in order to permit such auxiliary seats to be collapsed; in practice such deflectors were usually nailed on by the users to prevent loss or misplacement. I have provided a urine deflector which automatically assumes an operative position when the child's seat is in use, and, by cooperation with other members of the structure is placed in a position which permits the seat to be collapsed without detaching the deflector. To provide such an automatic non-detachable deflector, the seat opening * * * extends forwardly to provide a deflector receiving

slot * * * in which the deflector * * * is received so that the deflector may lie in the slot * * * and opening * * * when the child's toilet seat is closed. With the forward end of the deflector (in the collapsed position) curved and flush with the forward rim of the seat * * *, the deflector is pivoted on a transverse pivot pin * * * extending across the slot * * *."

The embodiment of the Nika '744 patent is "an aggregation of old and familiar mechanical features which, used together * * *, perform only the several normal and familiar functions which they have long been known and employed to perform separately. Thus, * * * the aggregation does not meet the established standard of patentable invention." Alco Kar Kurb, Inc. v. Ager, 3 Cir., 1961, 286 F.2d 931, 932. Hughes '813 patent clearly anticipates the Nika '744 patent; and Nika was chargeable with knowledge of the disclosures of Hughes. L. B. Smith v. Hughes, D.C.Pa. 1961, 190 F.Supp. 787, affd. 3 Cir., 1962, 296 F.2d 738, cert. den. 370 U.S. 953, 82 S.Ct. 1603, 8 L.Ed.2d 819. The invention claimed in the '744 patent was described in Nika's application for his '653 patent, filed September 2, 1950, which was more than one year prior to the date of his application for the '744 patent (June 8, 1955). 35 U.S.C. § 102(b).

The subject matter of the '744 patent, taken as a whole, would have been obvious to a person having ordinary skill in the art to which the subject matter pertains, at the time the alleged invention was made. 35 U.S.C. § 103. The patent is invalid.

A copy of the license agreement in suit, together with a copy of one of the blue prints referred to therein as Exhibit B, is annexed to the counterclaim. Exhibit A referred to in the agreement is a sample of the baby trainer embodying the claims of United States Patent No. 2,-

---

1. Claims 2, 3, 4 and 5 of the '744 patent simply teach the conformation of the deflector and its positioning in the recess in the front of the seat.

712,653 ('653) which Reliance was licensed to manufacture and sell by the terms of the agreement. It is a light plastic baby's toilet seat with back and arm rests so articulated and provided with spring tension that by folding the arm rests inwardly, they and the back rest may be collapsed from planes vertical to a plane horizontal with the plane of the seat. Similarly, by lifting the edge of the back rest, it and the two arm rests spring into interlocked vertical positions relative to the plane of the seat. Exhibit B (annexed to the counterclaim, and dated 12/6/54) does not fully delineate Exhibit A (the sample seat) referred to in the license agreement (dated December 17, 1955).

■■ Defendant charges that plaintiff has breached this agreement by modifying the construction of the seat of the trainer in numerous particulars. In support of this charge it relies upon paragraph 1 of the agreement which limits the right of the licensee to "manufacture, use and sell the specific and particular collapsible baby trainer marked 'Exhibit A' and made a part of this agreement." There is no doubt that plaintiff manufactured and sold a particular trainer which varied from the sample referred to as "Exhibit A". Plaintiff's model had wider flanges on the top edges of the sides and back, had additional ribs on the under side of the seat, ridges in front and to the rear of the slot at the rear of the seat provided for receiving the back, and protruding stop pins at the rear of each of the sides, all of which were additions to the sample referred to. Permission in writing for the effectuation of these changes from the sample was never obtained subsequent to execution of the December 17, 1955 agreement, as required by paragraph 2 thereof. However, it is plaintiff's contention that these changes were illustrated in certain blue prints which were given to the attorney for the licensor in accordance with the terms of the agreement, and that defendant, by accepting the blue prints without objection, is now estopped to assert violation of the agreement by what is displayed upon these prints. Paragraph 2 of the agreement states, in part: "It is understood and agreed between the parties hereto that the right to manufacture, use and sell granted to LICENSEE by this license is restricted to the specific construction exemplified by *the sample trainer and blue prints constituting Exhibits A, B, C and D,* and that LICENSEE shall not add to or alter in any respect the construction or design of such Baby Trainer without the consent of the LICENSOR first obtained in writing." (Emphasis supplied.) The blue prints referred to in this quoted language were those placed in the custody of Jiffy's attorney and they depict the alleged changes (with the exception of the under side ribs, a feature not depicted in the blue prints). I find that plaintiff has not breached the contract in the particulars (other than the under side ribs) set forth above, for the reason asserted by counsel. The addition of a bilateral longitudinal rib to the under side of the trainer seat I do not find to be a material change within the terms of the agreement. Nor, indeed, are any of the other changes listed above. I do not reach the materiality of the rubber bumpers added by plaintiff as cushions on the under side of the seat, as this feature is not urged as a breach by counsel for defendant in his post trial memorandum.

■ The remaining alleged breach involves the replacement by plaintiff, in 1959, of the one-piece plastic hinge by a steel two-plate hinge clamp with bolt and wing nut for fastening the trainer to the hinge bar of the adult toilet seat.

■ The contract underlying the counterclaim is stated therein to be a non-exclusive license to manufacture, use and sell a certain and specific style and design of collapsible baby trainer, falling within the scope of Jiffy's '653 patent. See DeForest Radio Telephone & Telegraph Co. v. Radio Corporation of America, 3 Cir., 1927, 20 F.2d 598. By its terms the license is restricted to the specific construction exemplified by the

sample trainer and blue prints constituting exhibits A, B, C and D, and the licensee is forbidden to add to or alter in any respect the construction or design of such baby trainer without the consent of the licensor first being obtained in writing. The licensor agrees that it will not unreasonably withhold consent to changes in the shape of the sides, back and seat, nor to immaterial changes in construction or materials; it being, however, understood that licensor was to be the sole judge of the materiality of any such proposed change. Such restrictions are lawful. General Talking Pictures Corp. v. Western Electric Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81; United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. Where such restrictions are exceeded by the licensee, the effect is precisely the same as if no license whatever had been granted to the licensee, who would therefore be an infringer. General Talking Pictures Corp. v. Western Electric Co., supra, 305 U.S. at p. 127, 59 S.Ct. 116, 83 L.Ed. 81. Counsel for the licensor contended at the trial that a breach of the agreement constituted an infringement of the '653 patent. There is no doubt that the breach alleged by defendant relating to the hinge member is material and substantial, and in violation of the agreement as contended. However, I do not find that such breach constitutes infringement of defendant's '653 patent. Claim 1 of the Nika '653 patent (issued July 12, 1955 on application of September 2, 1950) describes its embodiment as "[a]n infant's toilet seat attachment for adult toilet seats having a hinge rod at the rear thereof, comprising an infant's seat adapted to rest on the adult seat, rear and side walls pivotally secured to the infant's seat and adapted to collapse on the seat in the substantially flat condition, *a hinge member provided with means for attaching the same to the hinge rod of the adult seat,* and means pivotally connecting the forward edge of said member to the rear portion of the infant's seat forwardly of the hinge rod, whereby the collapsed toilet seat attachment may be swung rearwardly on said pivotal connection to a position past the vertical plane passing through such connection." (Emphasis supplied.) What is referred to in the foregoing claim as "a hinge member provided with means for attaching the same to the hinge rod of the adult seat" is, in the sample referred to in the license agreement, a light plastic resilient hinge intended to snap on to the steel hinge-bar of the adult seat. None of the eleven claims of the '653 patent, under which the contract was made, teaches the form or material of the hinge member of the infant's toilet seat, by means of which it is attached to the hinge rod of the adult seat. The description employed in Claim 1 is "a hinge member provided with means for attaching the same to the hinge rod of the adult seat." Claim 2 refers to the feature as a "means for detachably securing the seat to the hinge rod of the adult seat." Jiffy had been using metal hinges for some of its trainers during a period of three or four years prior to the execution of the agreement; but in 1956, after the agreement had been executed, Jiffy saw fit to substitute for the metal hinge a two-piece heavy plastic hinge with nut and screw combination. The specifications of the patent explain the drawings as disclosing a projection extending from the rear of the seat with a U-shaped hinge plate "which may be of *metal* * * * to which the fastening clamp arms * * * are hingedly connected * * *." (Emphasis added.)

In its amended counterclaim defendant does not seek patent infringement damages, but rather "damages for breach of contract and unfair competition and such other damages as are ascertained by assessment pursuant to the direction of the Court, and for costs and disbursements"; and also injunctive relief against plaintiff's manufacture, use or sale of baby trainers constructed other than as authorized by the agreement. Defendant recognizes that plain-

tiff was free to sell its trainers, constructed in accordance with the agreement, at any price it chose. The gravamen of defendant's charge of unfair competition as revealed in the amended counterclaim is that plaintiff manufactured and sold a baby trainer having the same general appearance, functional and non-functional characteristics as that first put out by the defendant, with which it was associated by the public; and by so doing, plaintiff created the likelihood of confusion in the trade.

▉ The evidence was barren of any basis for inference that any variation of the Reliance trainers from strict conformity with the sample trainer of Jiffy referred to in the agreement resulted in confusion of Reliance products with those of Jiffy. The Reliance trainers bore stamped thereon "Reliance, Woon., R.I.Lic.Pat. No. 2712653 Protect-O-Prod. U.S.A." while the Jiffy trainer was marked "Jiffy Products Pat. 2,-712,653 Other Pat. Pending." The sample trainer referred to in the agreement bore the simple legend "Protect-O-Prod. U.S.A." without other reference to the identity of its manufacturer. Moreover, the packaging of the product of each of the parties clearly distinguished the source of the merchandise within. The test of unfair competition is the likelihood of confusion. Perfectform Corp. v. Perfect Brassiere Co., 3 Cir., 1958, 256 F.2d 736; Gum v. Gumakers of America, 3 Cir., 1943, 136 F.2d 957; House of Westmore v. Denney, 3 Cir., 1945, 151 F.2d 261, 265. Indeed, confusion was prevented by the stamped legend upon the under side of the Reliance trainer seat, referred to above, and by the presence on Jiffy's products of "Jiffy DeLuxe" or "Jiffy Junior" in conjunction with the above quoted language relating to the manufacturer and the patent. Moreover, the provisions of the agreement *required* that the product of Reliance be *similar* in all substantial respects to the sample embodiment of the patent. The clear designation of the origin of the products of each of the parties obviates the likelihood of any confusion in that respect.

The right, if any, which Jiffy acquired by virtue of its agreement with Reliance, was that of limiting Reliance to the production and sale of baby trainers conforming to the sample and drawings referred to in the agreement, and to receive annual payments of $2,000 from the licensee for the privilege. The evidence clearly disclosed that Jiffy considered the trainer referred to in the agreement as somewhat mediocre, both esthetically and functionally. Before and after the agreement, Jiffy made improvements in its trainers to overcome the shortcomings which it apparently recognized in the sample trainer to which the agreement referred. The effect of the agreement was to secure to Jiffy $2,000 per annum as long as it remained effective, and to restrict Reliance's competition to the lower-class product. If Reliance exceeded the restrictions contained in the agreement to the extent of violating that agreement, and thereby committed a breach of the contract, Jiffy would be entitled to such damages as were within the contemplation of the parties when the contract was entered into, and which naturally and probably flowed from such breach. Counsel for Jiffy stated during the trial: "So long as they [Reliance] had stuck to that model, there would have been no trouble at all. But they promptly started out to change that model and finally ended up with one that wholesalers preferred to the Jiffy model *only because the price was lower*. Once Jiffy reduced its price, as it finally did to the lower price of the plaintiff's, then I think, as was brought out in the course of the trial, wholesalers purchased the Jiffy model because it was still a better device, heavier, stronger generally, and so they gave preference to Jiffy. But until that occurred they preferred the plaintiff's construction, and defendant unavoidably lost sales because of that. When (sic) defendant had to reduce its prices, even though it had a better article in order to meet this com-

petition and stay in business." (Emphasis supplied.) Jiffy, therefore, claims that a drop in its dollar sales resulted from its reduction of its prices in an effort to meet the plaintiff's price competition. It seeks recovery of the consequent loss of profits.

Despite any improvements which Reliance may have made upon the contract sample, with the exception of the year 1958 (before the change to metal hinge was effected), its sales in dozens of trainers progressively diminished from 9,760 in 1956, to 1,184 in 1962 (up to June). In June of the latter year, more than two years after this action was commenced, Reliance cancelled the agreement. Reliance, despite its progressively diminishing sales, continued to pay, and Jiffy continued to accept, $2,000 per annum during the period of almost seven years during which the agreement was in effect. At the outset the Reliance trainer sold for $1.98 retail. When the metal hinge was substituted for the plastic hinge, the retail price of the Reliance trainer was increased to $2.29. Jiffy also complains that its sales diminished from an annual rate of 108,000 units for the year 1955, to 64,501 units in 1959. However, this progression of sales diminution had commenced and was continuing before Reliance marketed its product with the metal hinge (in 1959). If there was competition by Reliance, it was created by price cutting, which was not prohibited by the agreement. Nevertheless, the sales of both parties progressively diminished while the contract was in effect.

There was admitted in evidence and marked D–15, a chart purporting to show in dollars annual sales of Jiffy folding training seats from July 1, 1951 to June 1961. The figures ranged from a high of $317,378 for the year ending June 30, 1953 to a loss of $149,746 as of May 31, 1961. For the year ending June 30, 1952, Jiffy's dollar sales were $270,137. Its sales for the fiscal year in which the contract in suit was executed totalled $278,514. They dropped to $230,651 as of June 30, 1956. They rose again to $239,012 as of June 30, 1957; and, at the end of the June, 1958 fiscal year, had again descended to $226,838. (It will be noted that all of these fluctuations occurred before Reliance commenced to market the units with the metal hinge assembly.) Jiffy claims that the red figures of $167,307 as of June 30, 1960, and $149,746 as of May 31, 1961, reflected the impact of the use of the metal hinge upon its trainer by Reliance. Another chart submitted in evidence disclosed that unit sales by Jiffy from January 1, 1955 to June 30, 1962 had diminished to 16,200 for its DeLuxe model and 29,232 for its Junior model. However, no evidence of cost figures was submitted to the Court from which might be discerned the net effect, if any, of the breach of the agreement charged.

There was evidence that the general market for infants' toilet training seats was highly competitive. There were twenty or more active manufacturers of such products, five of whom produced folding types of trainers. There was also an intrusion upon the market by foreign producers underselling the products of both of the present parties. (The gross sales for the industry as a whole were not disclosed in the evidence.) Roughly parallelling the progressive sales diminution reported by Jiffy was its series of advertising budget reductions from approximately $10,000 in 1960 to $4,000 in 1961 and to $1,500 in 1962.

The damages which Jiffy seeks to recover on its counterclaim are the lost profits which resulted from the adoption by Reliance of the metal hinge modification of the sample trainer referred to in the contract. Reliance had *no increase* in its sales volume following its adoption of the metal hinge.

Profits lost in consequence of a breach of contract may not always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. United States v. Behan, 1884, 110 U.S.

338, 4 S.Ct. 81, 28 L.Ed. 168; Howard v. Stillwell and Bierce Manufacturing Co., 1891, 139 U.S. 199, 11 S.Ct. 500, 35 L. Ed. 147.

In Howard v. Stillwell and Bierce Mfg. Co., supra, the Supreme Court of the United States, at p. 207, 11 S.Ct. at p. 503, quotes the rule for damages in breach of contract, in the language of Baron Alderson in Hadley v. Baxendale, 1854, 9 Exch. 341:

> " 'Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e. according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to· have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. * * * It follows, therefore, that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made this contract. For such loss would neither have flowed naturally from the breach of this contract in the great multitude of such cases occurring under ordinary circumstances, nor were the special circumstances, which, perhaps, would have made it a reasonable and natural consequence of such breach of contract, communicated to or known by the defendants.' "

Even assuming, as defendant argues, that the change made in the baby trainer by Reliance caused loss by reason of its compelling the defendant to cut prices in order to compete it is impossible to ascertain with any degree of accuracy how much of the loss was due to this breach of agreement and how much to decreased sales experienced by both of the parties to this litigation, and which has not been shown to have been causally related to the change of structure.

 In patent infringement cases it is the law that one suing upon a patent must, in order to establish his damages, be able to separate or apportion the infringer's profits between the feature which infringed the patent and those which did not. Such evidence must be reliable and tangible and not conjectural or speculative. Westinghouse Electric & Manufacturing Co. v. Wagner Electric and Manufacturing Co., 1912, 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222; Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co., 1915, 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; American Can Co. v. Goldee Manufacturing Co., D.C.N.Y.1927, 31 F.2d 492, affd. 2 Cir., 1929, 31 F.2d 494.

Reliance has pleaded waiver and estoppel as affirmative defenses to the counterclaim. The negotiations and correspondence leading up to the execution of the agreement referred to extended from September 30 to December 17, 1955. On February 27, 1956, Jiffy charged Reliance with breach of the contract consisting of its failure to place the name, address and Reliance's trade mark upon its product, as well as the notice of the '653 patent, and requested immediate remedy. Compliance with this request was reported by Reliance on March 23, 1956. On February 4, 1959, Reliance wrote Jiffy disclosing its proposal to change the hinge member of its Protect-O-Seat, and claiming to be privileged to make such change upon notification to Jiffy. Jiffy's attorney wrote Reliance on February 20, 1959 advising that Reliance was in error in its interpretation of the contract, and quoted paragraph 2 thereof. The same letter requested that Jiffy be furnished with detailed information in the form of blue prints respecting the changes proposed by Reliance, and required that Jiffy's consent in writing be obtained before the changes were made. To the foregoing communication, the attorney for Reliance wrote Jiffy on March 2, 1959, describing the change in the

hinge member which it contemplated, and enclosing a drawing thereof; at the same time requesting an immediate (by return mail) expression of Jiffy's approval of the proposed change so that Reliance might proceed therewith. There is no indication in the documentary evidence submitted for the Court's consideration, that any response was made to this request.

No further correspondence between the parties appears until September 28, 1959, when the attorney for Reliance wrote to the attorney for Jiffy, questioning the validity of the '744 patent, and rejecting any license thereunder.

On August 13, 1960 (after institution of this litigation) the attorney for Jiffy wrote to Reliance, demanding payment of the sum of $2,000 due on July 12, 1960 under the agreement. No reference is made in that letter to any breach of the agreement (other than that constituting the stated failure to make the payment when due), nor to any departure from the limitations of the agreement respecting the form of the product produced by Reliance.

Under date of January 24, 1961, the attorney for Jiffy wrote Reliance enclosing a copy of a letter dated December 5, 1960, which had been misdirected and returned to the writer. The misdirected letter purported to embody final notice to Reliance of its breach of the agreement with Jiffy, consisting of alterations in the construction of the sample trainer in material respects, without the consent of Jiffy. The changes there complained of are stated to have consisted of the replacement of the plastic clip-on clamp by a two-piece metal clamp with nut and bolt, the addition of reinforcing rib members on the under side of the ring, the reinforcement of the rear portion of the ring, and modification thereof to accommodate the new hinge, and the addition of rubber bumpers—the aggregate effect of which rendered the Reliance structure more closely similar to that of Jiffy. The letter stated that if Reliance did not promptly eliminate the complained of changes in its trainer, and return to the construction prescribed by the agreement, and so notify Jiffy, suit would be brought by Jiffy for the damages resulting from the breach. (This notification and requirement was given and made while the present action was pending, to which Jiffy had already interposed a counterclaim.)

In substance, Reliance contends that Jiffy was chargeable with knowledge that Reliance interpreted the contract as permitting changes in the structure of the product merely upon notice given in writing of intention so to do, and that it did not consider the employment of the metal hinge a substantial change. Reliance further contends that in continuing to accept the payments of $2,000 per year, in the face of the interpretation by Reliance of its rights under the contract, Jiffy was estopped to insist upon strict adherence to the contract provisions, and is deemed to have waived what Reliance asserts are minimal, if any, departures therefrom. The refutation of this plea of waiver is to be found in the provisions of the contract itself, to the effect that failure on the part of Jiffy to object shall not be deemed to amount to a waiver of the contract requirements. The defense of estoppel rests upon a somewhat different basis. The elements of an estoppel are a representation, an intention and expectation that a party will rely thereon, a reliance accordingly, ignorance by the party claiming estoppel of the matter represented, and a change of position on the part of the party relying upon the representations, to his disadvantage. I am not persuaded that Jiffy waived the provisions of its contract, or that Reliance changed its position under circumstances as to estop Jiffy from charging a contract breach. I find a breach of the contract by Reliance in using two-plate metal hinge members in its product. I find the change substantial. There is a lack, however, of sufficient preponder-

ance in the evidence to support a conclusion that Jiffy is entitled to more than nominal damages.

■ Where, as here, a right of action accrued to Jiffy for breach of its contract with Reliance, and the amount, if any, of loss caused by that breach is not so established that compensatory damages may be given, judgment will be given for nominal damages only—a small sum fixed without regard to the amount of harm. "A breach of contract always creates a right of action; but a breach sometimes occurs without causing any harm. In other cases the breach may cause extensive harm, but the plaintiff either cannot or does not establish a right to substantial compensation therefor as the rules * * * require. In all these cases the plaintiff can get judgment for nominal damages. The exact amount is fixed by statute or by custom of the jurisdiction where the action is brought." Restatement: Contracts, Chap. 12, § 328, comment a.

We accordingly have a breach of a contract but insufficient evidence of damage to the party complaining of that breach. In consequence this Court may only award nominal damages.

Upon the main action in this case, I have found that patent '744 is invalid, and therefore not infringed.

■ The issue raised by Jiffy's prayer for injunctive relief is moot because of Reliance's termination of the license agreement, pursuant to its terms.

The plaintiff's complaint is sustained, as is the breach of contract portion of the defendant's amended counterclaim; the remaining portions of the amended counterclaim are dismissed with prejudice. Judgment is awarded to defendant for nominal damages in the amount of six cents. See Dobson v. Hartford Carpet Company, 1885, 114 U.S. 439, 5 S.Ct. 945, 29 L.Ed. 177. No costs will be awarded to either party.

Let an appropriate order be submitted.